[No. S021118. Dec. 24, 1992.]

ROSS JOHNSON et al., Petitioners, v.
TOM BRADLEY as Mayor, etc., et al., Respondents.

## COUNSEL

Ross Johnson and Quentin L. Kopp, in pro. per., Kopp & Di Franco and L. Michael Bogert for Petitioners.

Scott Hallabrin and Jonathan S. Rothman as Amici Curiae on behalf of Petitioners.

James K. Hahn, City Attorney, Anthony Saul Alperin, Assistant City Attorney, and Raymond S. Ilgunas, Deputy City Attorney, for Respondents.

Louise H. Renne, City Attorney (San Francisco), Burk E. Delventhal and Thomas J. Owen, Deputy City Attorneys, L. B. Elam, County Counsel (Sacramento), John F. Whisenhunt, Deputy County Counsel, Sharon Siedorf Cardenas, City Attorney (Sacramento), Richard E. Archibald, Deputy City Attorney, John W. Witt, City Attorney (San Diego), John M. Kaheny, Assistant City Attorney, Christie C. Maguire, Deputy City Attorney, Geoffrey Cowan, Munger, Tolles & Olson, Bradley S. Phillips and Mark H. Epstein as Amici Curiae on behalf of Respondents.

## OPINION

**LUCAS, C. J.**—In this original mandamus proceeding petitioners seek to invalidate and enjoin enforcement of a campaign reform measure adopted by the voters of the City of Los Angeles to the extent the measure provides for the partial public funding of campaigns for city elective offices. Petitioners ground their challenge on Proposition 73, a statewide initiative that, inter alia, bans public financing of any election campaign. We conclude Proposition 73's prohibition on public financing does not preclude the City of Los Angeles from adopting and enforcing the public funding provisions of its campaign reform measure.

### I. *Facts and Procedure*

In June 1988, State Assemblyman Ross Johnson and State Senator Quentin Kopp (two of the three petitioners in this action)[1] successfully sponsored a statewide initiative, Proposition 73, which added chapter 5 to the Political Reform Act of 1974 (Gov. Code, §§ 81000-91015).[2] Article 3 of chapter 5, entitled "Contribution Limitations," imposed various restrictions on contributions to and by candidates and political committees or parties (§§ 85301-85307), and also provided in section 85300: "No public officer shall expend and no candidate shall accept any public moneys for the purpose of seeking elective office."

Two years later, the voters of the City of Los Angeles amended the city charter by adopting Measure H, a comprehensive campaign, election and ethics reform plan. Measure H provided for: (i) the creation of a city ethics commission to oversee, administer, and enforce the new ethics code; (ii) limitations on campaign contributions;[3] (iii) limitations on the total amount of contributions that a candidate may accept in any election; (iv) prohibitions on the transfer of contributions between candidates or their controlled committees; (v) disclosure of candidates' economic interests and income; and (vi) limitations on gifts and honoraria that public officials may accept.

Finally, unlike Proposition 73, which imposed limits on *contributions* but not on *spending* by candidates, Measure H also imposed spending limitations. The drafters of Measure H apparently realized that under *Buckley* v.

---

[1]Ernani Bernardi, a member of the Los Angeles City Council, is the third petitioner in this action. Ross, Kopp and Bernardi are collectively referred to herein as petitioners.

[2]All future statutory references are to this code unless otherwise indicated.

[3]Section 85101, subdivision (a), provides: "Nothing in this chapter shall affect the validity of a campaign contribution limitation in effect on the operative date of this chapter which was enacted by a local governmental agency and imposes lower contribution limitations." Similarly, subdivision (b) of the same section provides: "Nothing in this chapter shall prohibit a local governmental agency from imposing lower campaign contribution limitations for candidates for elective office in its jurisdiction."

*Valeo* (1976) 424 U.S. 1 [46 L.Ed.2d 659, 96 S.Ct. 612], spending limitations are constitutionally invalid unless they are conditioned on a candidate's acceptance of public funds. (*Id.*, at pp. 54-59 [46 L.Ed.2d at pp. 707-710]; see especially *id.*, at p. 57, fn. 65 [46 L.Ed.2d at p. 709].) Accordingly, Measure H provided for partial public funding of city political campaigns, and, correspondingly, spending limits on candidates who accept public funds. (Measure H, § 11.) As codified, this provision is now found in section 313 of the Los Angeles City Charter (hereafter charter section 313).

Subdivision A of charter section 313 sets out "Findings and Purposes." It states: "1. Monetary contributions to political campaigns are a legitimate form of participation in the American political process, but the financial strength of certain individuals or organizations should not permit them to exercise a disproportionate or controlling influence on the election of candidates. [¶] 2. Therefore, this section is enacted to accomplish the following purposes: [¶] (a) To assist serious candidates in raising enough money to communicate their views and positions adequately to the public without excessive expenditures or contributions, thereby promoting public discussion of the important issues involved in political campaigns. [¶] (b) To limit overall expenditures in campaigns, thereby reducing the pressure on candidates to raise large campaign funds for defensive purposes, beyond the amount necessary to communicate reasonably with the voters. [¶] (c) To provide a source of campaign financing in the form of limited public matching funds. [¶] (d) To substantially restrict fund-raising in non-election years. [¶] (e) To increase the value to candidates of smaller contributions. [¶] (f) To reduce the excessive fund-raising advantage of incumbents and thus encourage competition for elective office. [¶] (g) To help restore public trust in governmental and electoral institutions."

Subdivision B of charter section 313 provides for establishment of spending limitations and disbursement of matching funds. It states in relevant part, "The City shall . . . adopt by ordinance limitations on campaign expenditures by candidates for elective City office who qualify for and accept public matching funds. The City shall adopt by ordinance regulations concerning the use of public funds to partially finance campaigns for elective City office through a system of matching public funds for qualifying campaign contributions. . . ." Subdivision C(4) of charter section 313 provides, "[t]he funds used to make payments for matching funds shall come exclusively from City sources of revenues."

Petitioners invoked the original jurisdiction (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 731 [248 Cal.Rptr. 115, 755 P.2d 299]) of the Court

of Appeal to enjoin respondents[4] from implementing and enforcing charter section 313. The Court of Appeal issued an alternative writ and a temporary restraining order enjoining implementation and enforcement of the challenged section, and set the matter for argument.

Petitioners claimed section 85300 prohibits use of public money to fund political campaigns in local as well as statewide elections, and that charter section 313 is thus invalid and unenforceable. Respondents asserted petitioners lacked standing to sue, and, in any event, have failed to proceed against proper parties. On the merits, respondents claimed the City of Los Angeles, as a charter city under the state Constitution, may enact and enforce laws that conflict with general state laws, so long as the city regulates a "municipal affair" rather than a matter of "statewide concern," and that the decision to expend city monies as part of its electoral process reforms is a matter of local, not statewide, concern. Amici curiae on behalf of respondents argued that a then-recent federal district court decision rendered section 85300 inoperative, and that there was accordingly no conflict between general law and the city's charter.

The Court of Appeal rejected respondents' procedural claims, finding that at least one petitioner (Bernardi) had standing and that relief was properly sought against respondents. It then rejected the argument of amici curiae on behalf of respondents that section 85300 had been rendered inoperative as a result of proceedings (not then final) in the federal district court. Finally, by a split vote, it agreed with respondents that a charter city's decision to provide its own public funds to finance city political campaigns is a "municipal affair" and not a matter of "statewide concern," and, hence, charter section 313 prevails over section 85300. Accordingly, the court discharged the alternative writ, denied the peremptory writ of mandate, and dissolved the temporary stay. We granted review to address the municipal affairs issue.[5]

## II. The Constitutional Authority of Charter Cities Over "Municipal Affairs"

### A. The Evolution of "Home Rule" in California

Under the California Constitution of 1849, cities were "but subordinate subdivisions of the State Government," and the Legislature had power to

---

[4] Respondents are the Mayor of the City of Los Angeles, Tom Bradley, 11 members of the city council, the city controller, and the city clerk.

[5] We have reviewed the standing and "proper parties" issues cited above, and conclude neither was erroneously decided, and neither presents an important issue warranting our attention. (Cal. Rules of Court, rule 29(a).) Accordingly, although the parties discuss both issues in their respective briefs, we decline to address those issues here.

"enlarge or restrict" city powers. (*San Francisco* v. *Canavan* (1872) 42 Cal. 541, 557.) After the Constitution of 1879 was adopted, this court declared it was "manifestly the intent" of the drafters "to emancipate municipal governments from the authority and control formerly exercised over them by the Legislature." (*People* v. *Hoge* (1880) 55 Cal. 612, 618.) But, as one commentator observed, "[t]he cities . . . gained but little nourishment from this statement, for on its face [former] Section 6 of Article XI provided that general laws should override municipal charters and local laws."[6] (Comment, *Municipal Corporations: Municipal Home Rule; Municipal Market as a Public Purpose* (1923) 11 Cal.L.Rev. 446; see, generally, McBain, The Law and the Practice of Municipal Home Rule (1916), p. 200 et seq.)

Thereafter we held in a number of cases that the 1879 Constitution did in fact continue to subordinate charter city legislation to general state laws (*Davies* v. *City of Los Angeles* (1890) 86 Cal. 37, 41 [24 P. 771], and cases cited therein), and that if the power of "the legislature to interfere by general laws with the local affairs of a city . . . is an evil affecting the rights of city governments, the remedy is by amendment of the constitution." (*Id.*, at p. 42.)

In apparent response to *Davies, supra,* and related litigation, in 1896 article XI was amended in two significant respects. Former section 6 was revised to read as follows: "Cities or towns heretofore or hereafter organized, and all charters thereof framed or adopted by authority of the constitution, *except in municipal affairs,* shall be subject to and controlled by general laws." (Italics added.) In addition, former section 8 was adopted, allowing consolidated charter city and county governments to regulate "the manner in which, the times at which, and the terms for which the several county officers shall be elected . . . [and] for their compensation . . . ." (See Van Alstyne, Background Study Relating to Article XI, Local Government, Cal. Const. Revision Com., Proposed Revision (1966) pp. 278-279 [hereafter Background Study].)

The lead opinion in *Fragley* v. *Phelan* (1899) 126 Cal. 383 [58 P. 923], discussed "the reasons which moved the legislature to propose the amendment [to article XI, former section 6], and the people to adopt it. What was the evil to be remedied? What was the good to be gained by this amendment? The answer is common, every-day history. It was to prevent existing provisions of charters from being frittered away by general laws. It was to enable municipalities to conduct their own business and control their own affairs to the fullest possible extent in their own way. *It was enacted upon the*

---

[6]The section provided, "all charters . . . framed or adopted by authority of this constitution shall be subject to and controlled by general laws."

*principle that the municipality itself knew better what it wanted and needed than the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs. . . .* This amendment, then, was intended to give municipalities the *sole* right to regulate, control, and govern their internal conduct independent of general laws . . . ." (*Id.,* at p. 387 (per Garoutte, J.), italics added; see, generally, Sandalow, *The Limits of Municipal Power Under Home Rule: A Role for the Courts* (1964) 48 Minn.L.Rev. 643, 644-648 [describing sentiment underlying "home rule" movement of late 19th century].)

Justice Harrison's concurring opinion in *Fragley* v. *Phelan, supra,* 126 Cal. 383, 391, suggested a significant caveat: He asserted that unless a charter expressly provided for municipal control over a particular concern, general state law would prevail. (*Id.,* at pp. 395-396 (conc. opn. of Harrison, J.).) In effect, this meant that city charters were "not paramount to general state laws, even as to purely municipal affairs, in cases where the charter was silent." (Comment, *Municipal Corporations: Home Rule Charters: Application of the Workmen's Compensation Act* (1926) 15 Cal.L.Rev. 60, 60-61.) In conformity with this view, we held, in *Nicholl* v. *Koster* (1910) 157 Cal. 416 [108 P. 302], that although article XI, former section 8½ granted charter cities the power to enact laws regulating municipal elections and compensation of municipal officers, such local laws could be given no effect if the city charter was silent on that subject. (*Id.,* at pp. 420-421.) As a result, municipalities that wished to exercise their constitutionally granted exclusive control over municipal affairs were forced to adopt "bulky charters" that attempted to enumerate specifically and extensively their municipal powers.

An article published in 1913 criticized this state of "municipal affairs" law, and proposed a constitutional amendment to article XI. The author suggested "that the wording of the ['municipal affairs'] clause be so altered as to imply in and of itself a grant, to all cities organized under freeholders' charters, of a power to legislate in all municipal affairs [whether or not a specific function is listed as a "municipal affair" in a city charter]." (Jones, *"Municipal Affairs" in the California Constitution* (1913) 1 Cal.L.Rev. 132, 145.)

The next year, article XI was amended as suggested by the voters at the November General Election. Former section 6 of article XI was revised to give charter cities the power "to *make and enforce all laws and regulations in respect to municipal affairs,* subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws." (Italics added.) Former section

8 of the same article was likewise amended by the insertion of a similar provision: "It shall be competent in any charter framed under the authority of this section to provide that the municipality governed thereunder may *make and enforce all laws and regulations in respect to municipal affairs*, subject only to the restrictions and limitations provided in their several charters and in respect to all other matters they shall be subject to general laws." (Italics added.) Finally, former section 8½ of article XI was amended to read: "It shall be competent, in all charters . . . , to provide, in addition to those provisions allowable by this Constitution, . . . as follows: [¶] 4. . . . . [As to] any city or consolidated city and county, . . . *plenary authority is hereby granted*, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several county and municipal officers . . . shall be elected . . . [and] for their compensation . . . ." (Italics added.)

After the amendments of 1914, the "municipal affairs" aspects of these provisions remained essentially unaltered for over half a century. In 1968, as part of the general overhaul of the state Constitution, the California Constitution Revision Commission recommended to the Legislature that the above sections be retained in substance but rewritten and renumbered as new article XI, section 5. (See Cal. Const. Revision Com. (Feb. 1968) Proposed Revision of the Cal. Const., pp. 59-60.) Eventually, the voters approved revised article XI, section 5, at the June 1970 Special Election.

## B. *Article XI, Section 5*

Article XI, section 5 of the state Constitution (hereafter article XI, section 5) addresses the "home rule" powers of charter cities in two distinct subdivisions. Subdivision (a) sets out the general principle of local self-governance, and provides: "It shall be competent in any city charter to provide that the city governed thereunder may *make and enforce all ordinances and regulations in respect to municipal affairs*, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution[7] shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith." (*Id.*, subd. (a), italics added.)

---

[7]Article XI, section 3 of the state Constitution sets out the procedures by which a city or county may adopt a charter. Article XI, section 4 concerns the scope and effect of county charters.

Whereas subdivision (a) of article XI, section 5 articulates the general principle of self-governance, subdivision (b) sets out a nonexclusive list[8] of four "core" categories that are, by definition, "municipal affairs." The first three categories of municipal affairs are: (1) regulation, etc., of "the city police force"; (2) "subgovernment in all or part of a city"; and (3) "conduct of city elections." The final category gives charter cities exclusive power to regulate the "manner" of electing "municipal officers." It provides, "(4) *plenary authority* is hereby granted, subject only to the restrictions of this article, to provide [in all city charters for] *the manner in which,* the method by which, the times at which, and the terms for which *the several municipal officers . . . shall be elected . . . .*" (Italics added.)

### III. *Recent Application of Article XI, Section 5*

In *California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1991) 54 Cal.3d 1 [283 Cal.Rptr. 569, 812 P.2d 916] (*CalFed*), we construed article XI, section 5, subdivision (a), the "general" municipal affairs clause. We concluded subdivision (a) does not permit a charter city to impose local income taxes on "savings banks" exempted from such taxes by general statewide law. Because the analysis employed in *CalFed, supra,* assists our resolution of the present matter, we will review that case in some detail.

We first surveyed the general state law that exempts savings banks from municipal taxation, and which supported the Legislature's stated goal of achieving uniform regulation of all such entities by barring local taxation of all financial institutions. (*CalFed, supra,* 54 Cal.3d at pp. 7-10.) We then analyzed various cases decided under article XI, section 5, subdivision (a), and concluded that they "reject a static and compartmentalized description of 'municipal affairs' in favor of a more dialectical one. Out of these cases emerges the counterpoint of 'statewide concern' as a conceptual limitation on the scope of 'municipal affairs' and thus on the supremacy of charter city measures over conflicting legislative enactments." (54 Cal.3d at p. 13; see also p. 16 [" 'No exact definition of the term "municipal affairs" can be formulated and the courts have made no attempt to do so, but instead have indicated that judicial interpretation is necessary to give it meaning in each controverted case.' "].) At the same time, however, we noted that "our decisions have also strived to confine the element of judicial interpretation by hedging it with a judicial procedure intended to bring a measure of certainty to the process . . . ." (*Id.* at p. 16.)

We continued: "In broad outline, a court asked to resolve a putative conflict between a state statute and a charter city measure initially must

---

[8]See *Adams* v. *Wolff* (1948) 84 Cal.App.2d 435, 442-443 [190 P.2d 665].

satisfy itself that the case presents an actual conflict between the two. If it does not, a choice between the conclusions 'municipal affair' and 'statewide concern' is not required." (*CalFed, supra*, 54 Cal.3d at p. 16.) We observed that many of the cases decided under our Constitution's municipal affairs clause have not, on closer examination, presented an actual conflict between local and statewide law, and we cautioned future courts to avoid unnecessarily entertaining substantive municipal affairs questions: "To the extent difficult choices between competing claims of municipal and state governments can be forestalled in this sensitive area of constitutional law, they ought to be; courts can avoid making such unnecessary choices by carefully insuring that the purported conflict is in fact a genuine one, unresolvable short of choosing between one enactment and the other." (*Id.*, at pp. 16-17.) [9]

We then articulated a framework for resolving municipal-affairs and statewide-concern questions under subdivision (a) of article XI, section 5. When the local matter under review "implicates a 'municipal affair' and poses a genuine conflict with state law, the question of statewide concern is the bedrock inquiry through which the conflict between state and local interests is adjusted. If the subject of the statute fails to qualify as one of statewide concern, then the conflicting charter city measure is a 'municipal affair' and 'beyond the reach of legislative enactment.' . . . If, however, the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related [and 'narrowly tailored'[10]] to its resolution, then the conflicting charter city measure ceases to be a 'municipal affair' pro tanto and the Legislature is not prohibited by article XI, section 5 [, subdivision] (a), from addressing the statewide dimension by its own tailored enactments." (*CalFed, supra*, 54 Cal.3d at p. 17.)

We further explained, "The phrase 'statewide concern' is thus nothing more than a conceptual formula employed in aid of the judicial mediation of jurisdictional disputes between charter cities and the Legislature, one that facially discloses a *focus on extramunicipal concerns*[11] as the starting point for analysis. *By requiring, as a condition of state legislative supremacy, a dimension demonstrably transcending identifiable municipal interests, the phrase resists the invasion of areas which are of intramural concern only,*

[9]We note that, under the 1914 constitutional amendments (*ante*, pp. 396-397), a "conflict" may exist between state and local authority even though the city has not specifically legislated on that point through its charter, or by other "enactment." (See *City of Pasadena* v. *Charleville* (1932) 215 Cal. 384, 387, 391-392 [10 P.2d 745].)

[10]See *post*, page 400.

[11]Elsewhere in our opinion we cited *Ex Parte Braun* (1903) 141 Cal. 204 [74 P. 780], as "the paradigm of a legislative effort to prescribe a core municipal activity—local taxation—without support originating in identifiable statewide concerns." (*CalFed, supra*, 54 Cal.3d at p. 17.)

*preserving core values of charter city government.* As applied to state and charter city enactments in actual conflict, 'municipal affair' and 'statewide concern' represent, Janus-like, ultimate legal conclusions rather than factual descriptions. Their inherent ambiguity masks the difficult but inescapable duty of the court to, in the words of one authoritative commentator, 'allocate the governmental powers under consideration in the most sensible and appropriate fashion as between local and state legislative bodies.' " (*CalFed, supra,* 54 Cal.3d at p. 17, italics added, quoting Background Study, *supra,* at p. 239.)

We summarized the dispositive issue as follows: "In cases presenting a true conflict between a charter city measure . . . and a state statute, . . . the hinge of the decision is the identification of a convincing basis for legislative action originating in extramural concerns . . . ." (*CalFed, supra,* 54 Cal.3d at p. 18.) Turning to the question before us in *CalFed,* we stated, "We must decide whether . . . the showing before the superior court supports the Legislature's finding of a need for paramount state control over the aggregate income tax burden on financial corporations such as petitioner." (*Ibid.*) After reviewing the legislative history of the statutory scheme, we concluded, "the Legislature's decision to modify the tax system by eliminating local taxes on savings banks finds substantial support in the regulatory and historical context summarized above, . . . and is *narrowly tailored* to resolve the problem at hand. [Citation.] [¶] Support for the conclusion that the local taxation of savings banks is at present[12] a subject of statewide concern is strengthened by the *limited extent of the incursion* made by [the state statute] . . . . [W]e are mindful of [the] caveat that 'the sweep of the state's protective measures may be no broader than its interest. [Citation.] Here, the *limited interference* with municipal taxation wrought by [the state statute] is substantially coextensive with the state's underlying regulatory interest." (*Id.* at pp. 24-25, italics added.)

IV. *Analysis*

A. *"Actual Conflict" Between State and Charter City Law*

■ As we explained in *CalFed, supra,* 54 Cal.3d 1, the first step in a reviewing court's inquiry is to determine whether there is an "actual conflict" between general state law and charter city authority. Accordingly, we would normally address initially the claim raised by amici curiae for respondents that section 85300 has been rendered inoperative as a result of proceedings in federal court. We decline to do so in this case, however,

---

[12]We explained that a matter could change in character over time, based on changed conditions. (See *id.* at pp. 17-18.)

because: (i) the same and related severability issues are pending before us in *Gerken* v. *Fair Political Practices Com.* (S025815), and will be resolved in that case; (ii) this case presents an important issue of constitutional law that potentially affects all charter cities (see *United Farm Workers of America* v. *Superior Court* (1976) 16 Cal.3d 499, 503-504 [128 Cal.Rptr. 209, 546 P.2d 713]), the issue is well briefed in this court by the parties and various amici curiae, and furthermore, although not controlling, "[a]ll parties on the appeal appear to wish a decision" on the municipal affairs/statewide concern issue (*People* v. *West Coast Shows, Inc.* (1970) 10 Cal.App.3d 462, 468 [89 Cal.Rptr. 290]); and, finally, (iii) regardless of how we resolve the severability issue in this case, the result will be the same because we conclude that even if section 85300 survives, the city retains the authority to adopt the challenged regulation of its own "municipal affairs."

### B. *Application of Article XI, Section 5 to the Facts of This Case*

Respondents and amici curiae on their behalf focus initially on subdivision (b)(4) of article XI, section 5. They assert charter section 313 is a regulation concerning the "manner" by which municipal officers are elected, and thus it is by definition a core municipal affair over which the city may exercise "plenary authority" to the exclusion of all general laws. Alternatively, they claim, charter section 313 is a "municipal affair" under subdivision (a) of article XI, section 5, as that provision was construed in *CalFed*, *supra*, 54 Cal.3d 1. Petitioners challenge both propositions. We address these points seriatim.

#### 1. *Analysis of Charter Section 313 Under the City's "Plenary Authority" to Regulate "the Manner" by Which Municipal Officers Are Elected—Subdivision (b)(4) of Article XI, Section 5*

In *Mackey* v. *Thiel* (1968) 262 Cal.App.2d 362 [68 Cal.Rptr. 717] (*Mackey*), the court addressed article XI, former section 8½, which, like its successor, article XI, section 5, subdivision (b)(4), granted charter cities "plenary authority" over the "manner" by which municipal officers are elected. At issue in *Mackey* was Elections Code, former section 10012.5 (presently § 10012), which provides that if a candidate for local office so requests, the county clerk "shall" send to voters, in the sample ballot package, a written statement of the candidate's qualifications, prepared by the candidate.

The petitioner submitted his statement to the county clerk, but the clerk refused to comply with the statute, on the ground the statute does not apply to charter cities, and the city's election code made no provision for mailing

of candidate qualification statements. The trial court eventually issued a peremptory writ of mandate ordering the clerk to comply with the statute. On review, the Court of Appeal reversed.

The court noted that the city's election code established "a comprehensive set of rules governing all phases of city elections" and that it "provides for certain information of a substantive nature respecting *issues* to be included with the mailing of sample ballots but not *candidate qualification* booklets as provided in [Elections Code, former] section 10012.5." (*Mackey, supra,* 262 Cal.App.2d at p. 364, italics in original.) It also noted that article XI, former section 8½ of the Constitution granted "plenary authority" to the city over the "manner" by which municipal officers are elected, and characterized the petitioner's argument as follows: "Such 'plenary authority' having been given to the City, . . . it is contended that [City's] code . . . should prevail over the provisions of [Election Code, former] section 10012.5 . . . ." (*Mackey, supra,* 262 Cal.App.2d at p. 364.)

The court proceeded to impliedly accept the petitioner's argument. In doing so, it acknowledged the respondent's assertion that Elections Code, former section 10012.5 reflected a concern for "the creation of an informed and educated electorate on a statewide basis" (*Mackey, supra,* 262 Cal.App.2d at p. 365), and it conceded the "plausibility" of the respondent's claim that the statute reflected a statewide concern that the qualifications of elected officials be made known to voters. (*Ibid.*) Nevertheless, it concluded the state was precluded from enforcing the provision in charter city elections because "California courts have already determined that the conduct of municipal elections is a municipal affair and subject to municipal control. (*Socialist Party* v. *Uhl* [(1909)] 155 Cal. 776, 788 [103 P. 181].)"[13] (*Mackey, supra,* 262 Cal.App.2d at p. 365.)

Petitioners assert *Mackey* and the cases on which it relies (e.g., *Uhl, supra,* 155 Cal. 776; *City of Redwood City* v. *Moore* (1965) 231 Cal.App.2d 563 [42 Cal.Rptr. 72] [disapproved on other grounds in *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 63, fn. 6 (81 Cal.Rptr. 465, 460 P.2d 137)]) are distinguishable because they involved local election "procedures," and not the integrity of the political or electoral process itself. The latter matter,

---

[13]*Socialist Party* v. *Uhl* (1909) 155 Cal. 776 [103 P. 181] (*Uhl*) concerned election procedures for nominating municipal officers. A statewide statute regulated such elections, but specifically exempted from its reach charter cities " 'whose charters provide a system of nominating candidates . . . .' " (P. 787.) We rejected the assertion that this exemption rendered the statute a void "special law" because, we explained, the statute could not properly regulate the nomination procedures of a charter city in any event. "[T]he election of municipal officers is strictly a municipal affair . . . [and] city charters prevail over the general law as far as regulating the method in which a charter election shall be conducted." (*Id.* at p. 788.)

petitioners assert, is a statewide concern and hence the exclusive province of the state under the Political Reform Act of 1974, and the amendments thereto (§§ 81000-91015).[14] They further claim charter section 313 does in fact aim at regulating the integrity of the political or electoral process, not simply the "manner" of electing municipal officers, and hence the city's regulation is not a municipal affair under article XI, section 5, subdivision (b)(4).

In essence, petitioners ask us to interpret narrowly the word "manner," as used in the constitutional provision, to exclude all local election regulations except those that may be labeled "procedural." But as the court in *Mackey*, *supra*, 262 Cal.App.2d 362, acknowledged, and as the respondent in that case argued, the conflict in *Mackey* could not fairly be described as procedural: the question was a substantive one, i.e., whether information about candidates' qualifications should be mailed to voters. It thus appears that the election provisions at issue in *Mackey* implicated concerns similar to what petitioners describe as the integrity of the political or electoral process, which is concededly an issue of statewide concern. Yet the *Mackey* court upheld a charter city's right to adopt a different course and decline to follow the state statute. This holding suggests that the constitutional provision granting charter cities "plenary authority" over the "manner" of electing municipal officers has a broader scope than envisioned by petitioners. We conclude petitioners offer no persuasive justification to question the reasoning or result in *Mackey*, and we are reluctant to endorse the narrow scope of the word "manner" advocated by petitioners.

We are hesitant, however, to embrace the expansive view of article XI, section 5, subdivision (b)(4), advanced by respondents and their amici curiae. They assert, with some force, that partial public financing of municipal election campaigns is "one way to elect municipal officials," although it is "certainly . . . not the only 'manner' in which to do so." They reason that under the plain words of article XI, section 5, subdivision (b)(4), partial public funding of local campaigns, being a "manner" of municipal elections, is a subject within the city's plenary regulatory authority that falls within the core definition of a "municipal affair" under that constitutional provision.[15] Although we believe charter section 313 clearly "implicates" a municipal affair (see *CalFed*, *supra*, 54 Cal.3d 1, 17), we need not, and do not,

---

[14]As explained below, although we agree with petitioners that charter cities may not enforce laws that are inconsistent with or impede statewide regulation of the integrity of the political or electoral process, we question petitioners' assertion that section 85300 is reasonably calculated to address that statewide concern.

[15]Of course, even if a given matter is deemed to be a municipal affair, a charter city's regulation remains subject to the various guarantees and requirements of the state and federal Constitutions. (See, e.g., *Canaan* v. *Abdelnour* (1985) 40 Cal.3d 703, 710 [221 Cal.Rptr. 468,

determine whether charter section 313 is by definition a "core" municipal affair under article XI, section 5, subdivision (b)(4), because we conclude that in any event, the charter section is enforceable as a municipal affair under article XI, section 5, subdivision (a), as that provision was recently construed in *CalFed, supra.*

 2. *Analysis of Charter Section 313 Under the City's General "Home Rule" Authority of Article XI, Section 5, Subdivision (a)*

■ Under *CalFed, supra,* 54 Cal.3d 1, once we conclude, as above, that "the matter implicates a 'municipal affair' and poses a genuine conflict with state law" (*id.,* at p. 17), our inquiry under article XI, section 5, subdivision (a) of the Constitution proceeds in two discrete steps. First, we focus on whether the conflicting state law—here, section 85300—qualifies as a matter of "statewide concern." If the state statute does not qualify as a matter of statewide concern, the conflicting charter city measure (or practice) is a "municipal affair" and " 'beyond the reach of legislative enactment.' " (54 Cal.3d at p. 17.) If the state statute qualifies as a statewide concern, we next consider whether it is both (i) reasonably related to the resolution of that concern, and (ii) "narrowly tailored" to limit incursion into legitimate municipal interests. If it meets this final test, "then the conflicting charter city measure ceases to be a 'municipal affair' pro tanto and the Legislature is not prohibited by article XI, section 5[, subdivision] (a), from addressing the statewide dimension by its own tailored enactments." (*Ibid.*)

 a. *Does Section 85300 Qualify as a Matter of Statewide Concern?*

■ Petitioners assert four grounds (and various subpoints) on which to base their claim that section 85300 addresses a statewide concern.

In the Court of Appeal, and to a lesser extent in this court, petitioners assert that because the drafters of Proposition 73 and those who voted for the measure *intended* to create a statewide rule barring public funding of all election campaigns, section 85300 addresses a matter of statewide concern. In support, they cite dictum in *Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 61-62, which, when read in isolation, suggests that intent of drafters or

710 P.2d 268, 69 A.L.R.4th 915] et seq. [striking, on equal protection grounds, charter city provision banning write-in voting]; *Rees* v. *Layton* (1970) 6 Cal.App.3d 815, 822-823 [86 Cal.Rptr. 268] [striking, on equal protection grounds, charter city provision allowing only incumbent to state occupation on ballot].)

voters to treat a matter as a statewide concern renders the matter a statewide concern.[16]

This point need not detain us long. ■ The assertion that a legislative body may define what is, and is not, a matter of statewide concern was rejected in *Bishop* v. *City of San Jose* itself: "[T]he fact, standing alone, that the Legislature has attempted to deal with a particular subject on a statewide basis is not determinative of the issue as between state and municipal affairs . . . ; stated otherwise, the Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern." (1 Cal.3d at p. 63; see also *id.*, at p. 63, fn. 6 [disapproving contrary cases]; Sonoma County *Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 317 [152 Cal.Rptr. 903, 591 P.2d 1].) As we explained in *CalFed*, *supra*, 54 Cal.3d 1, our inquiry regarding statewide concern focuses not on the legislative body's intent, but on "the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations." (*Id.*, at p. 18.) In other words, we must be satisfied that there are good reasons, grounded on statewide interests, to label a given matter a "statewide concern."

■ Petitioners next cite *County of Sacramento* v. *Fair Political Practices Com.* (1990) 222 Cal.App.3d 687 [271 Cal.Rptr. 802] (*County of Sacramento*) for the proposition that campaign financing, and public financing of political campaigns in particular, is a matter of statewide concern. In *County of Sacramento*, *supra*, the court addressed a conflict between section 85300 and a *charter county's* regulation that, like charter section 313, provided for partial public funding of county election campaigns, and for corresponding spending limits on such campaigns. After noting that the constitutional provisions relating to charter counties (art. XI, §§ 3, 4) are less expansive than those relating to charter cities (art. XI, § 5) the court expressed doubt that charter counties have any authority over financing of county election campaigns. It concluded, "it is self-evident that campaign financing of election contests, both state and local, is a matter of statewide concern and thus beyond the proper purview of [charter] county regulation." (222 Cal.App.3d at p. 690.)

*County of Sacramento*, *supra*, is plainly distinguishable. There, the court construed constitutional provisions (relating to charter counties) that, in

---

[16]The cited passage from *Bishop*, *supra*, reads: "As to matters which are of statewide concern, however, home rule charter cities remain subject to and controlled by applicable general state laws regardless of the provisions of their charters, if it is the intent and purpose of such general laws to occupy the field to the exclusion of municipal regulation . . . ." (1 Cal.3d at pp. 61-62.)

contrast to article XI, section 5, contain no general reservation of local autonomy, and no grant of "plenary" authority over local election matters.[17] The court's quoted conclusion is also highly questionable. It offered no "convincing basis" for its determination that public financing of election campaigns, and partial public funding of local election campaigns in particular, is necessarily a matter of statewide concern. Instead, the court simply asserted that public funding might, for some unarticulated reason, adversely affect the integrity of election contests by contributing to "corruption or undue influence caused by financial interests." (222 Cal.App.3d at p. 692.) As explained below, we discern no basis for the conclusion that partial public funding of election campaigns would exacerbate those problems; indeed, the available evidence, and logic, suggest the opposite.[18]

In essence, the *County of Sacramento* decision appears to rest almost exclusively on the ground that the drafters and voters "*intended* to establish a *single body of law* pertaining to the financing of election campaigns." (222 Cal.App.3d at p. 692, italics added.) As we explained above, however, the voters' intent that a matter be treated on a statewide basis does not make that matter a statewide concern. Furthermore, the bare interest of "uniformity in the manner of electing officials" is no justification for treating public funding of municipal elections as a statewide concern, because, standing alone, it reveals no "convincing basis for legislative action originating in extramunicipal concerns." (*CalFed, supra,* 54 Cal.3d at p. 18.) Accordingly, we decline to accept *County of Sacramento*'s holding that campaign financing, and in particular, partial public funding of local election campaigns, is a statewide concern, because neither the *County of Sacramento* court, nor petitioners or their amicus curiae herein, have established any convincing reason, grounded on statewide interests, supporting Proposition 73's attempt to treat public funding of election campaigns as a "statewide concern."

---

[17]Sato, *"Municipal Affairs" in California* (1972) 60 Cal.L.Rev. 1055, 1115, observes: "[N]owhere in the constitution is there a reference to the municipal affairs, much less the county affairs, of a chartered county. . . . [I]t is unlikely that a chartered county enjoys the same degree of autonomy as a chartered city." (Accord, Van Alstyne, Background Study, *supra,* at pp. 140-143 [discussing scope of charter county home rule powers], and 237 [contrasting charter city home rule powers with charter county home rule powers].)

[18]The *County of Sacramento* decision was also motivated by the fear that allowing such local control would "necessarily" imply that local charter governments may, at will, exempt themselves from the "conflict of interest" and other "electoral integrity" statewide regulations set out in the Political Reform Act of 1974 (§§ 81000-91105). (222 Cal.App.3d at pp. 693-694.) These concerns are unfounded. Beyond doubt, electoral integrity—and the regulation of "conflict of interest" in particular (e.g., § 87100 et seq.)—is a statewide concern. Accordingly, as explained elsewhere in this opinion, charter cities may not exempt themselves from statutes that are both (i) reasonably calculated to resolve such statewide concerns, and (ii) narrowly tailored to intrude as little as possible on legitimate local interests.

In their effort to identify a statewide concern, petitioners advance various arguments relating to fiscal matters. First, they point to ballot arguments advising the voters that "too much money is being spent on political campaigns today." From these and other ballot statements, petitioners conclude the electorate was "clearly informed Proposition 73's aim was reducing the costs of political campaigns through a system of contribution limitations and prohibition on public funding." In other words, they identify as a statewide concern the protection of the public fisc.

We do not doubt that conservation of the *state's* limited funds is a statewide concern. But petitioners, understandably, do not attempt to justify the public funding ban on the ground that it is designed to protect state revenues, because a local public funding law that draws its revenues exclusively from local taxes would obviously not implicate a concern for protecting the state fisc. Instead, petitioners suggest there is a legitimate statewide concern in how local tax proceeds are expended.

On this point, we agree with the Court of Appeal below, which observed, "[W]e can think of nothing that is of greater municipal concern than how a city's tax dollars will be spent; nor anything which could be of less interest to taxpayers of other jurisdictions. [Charter section 313, subdivision (C)4] expressly limit[s] the monies to be utilized for campaign financing to city funds. Thus, payments received by the city from state or federal governmental agencies may not be used. These are the city taxpayers' own dollars and those taxpayers, together with their city council, have voted to utilize those dollars to help finance political campaigns for city elective offices as a central if not critical part of major political campaign and ethics reform. That Proposition 73 expressly dealt with this subject and intended that its prohibition extend to campaigns and candidates for local office does not convert the decision of the City of Los Angeles, to follow a different path with its own money, into a matter of statewide concern."

Petitioners also advance two variations on the fiscal concern described above in their attempt to establish a statewide concern. They focus on ballot arguments by the proponents of Proposition 73 to the effect that public funding might: (i) divert scarce tax funds from local needs such as "police protection, fire protection, or schools"; and (ii) be made available to "extremist candidates" such as "communists or members of the Ku Klux Klan" with whom many voters disagree.

We reject the first claim because it is merely a variation on the argument presented and rejected above, i.e., that the manner in which local tax proceeds are expended is a legitimate statewide concern. Moreover, it proves

too much, by effectively negating the authority of charter cities to regulate any municipal affair that involves expenditure of funds.

The second claim was not raised in petitioners' briefs in the Court of Appeal, and in their briefs before this court they devote merely two undeveloped paragraphs to it. Their treatment of this issue consists of the following: In their opening brief they state, "The federal experience in matching Presidential campaign funds amply supports the fears expressed in the ballot arguments that extremist candidates could receive state and local . . . taxpayers' dollars to press their political agenda. On September 27, 1989, the Federal Election Commission reported that Lyndon H. LaRouche received $825,576.99 for the 1988 election cycle."

In their reply brief petitioners complain that "Respondents offer no rebuttal to the statewide concern expressed by the voters that *candidates expressing extremist messages should be required to raise their own campaign contributions and not rely on public financing.*" (Italics added.) In other words, petitioners appear to assert there is a legitimate statewide concern regarding the funding of political campaigns of candidates who are "extremists"—i.e., outside the mainstream of political thinking. They fail, however, to explain what legitimate interest the state might have in discriminating against "non-mainstream" candidates who otherwise qualify for matching funds under the objective eligibility criteria for receiving such funds.[19] Accordingly, we reject this ground of alleged statewide concern.[20]

Finally, petitioners assert: (i) the "integrity of the electoral process" is itself a statewide concern; (ii) section 85300's ban on public funding of

---

[19]Under both the federal "matching funds" provisions for Presidential candidates, and under charter section 313, candidates must make specific objective showings of voter support in order to be eligible for public campaign funds. (See *Buckley* v. *Valeo, supra,* 424 U.S. 1, 88-90, 96 [46 L.Ed.2d 659, 726-728, 713-732]; Los Angeles Mun. Code, § 49.7.19.) Under charter section 313, for example, a city council candidate must, inter alia, receive contributions (from other than himself or herself or family) of at least $25,000 over a specified time period in order to qualify for partial matching funds. In calculating the threshold eligibility amount, the city's code provides that a candidate for the council "may receive a contribution up to the allowable contribution limits [i.e., $500 (charter § 312, subd. C(5))] but only the first . . . $250 . . . shall count toward the qualification threshold." (Los Angeles Mun. Code § 49.7.19. A.1.) Similar (albeit higher) contribution limits and eligibility requirements are placed on city controller, city attorney, and mayoral candidates. (*Ibid.*)

[20]We do not construe petitioners' argument in this regard as advancing a contention that Proposition 73 sought to preclude public funding of political campaigns on grounds that such funding might violate taxpayers' "freedom of association" under the federal First Amendment. (Cf., e.g., *Keller* v. *State Bar of California* (1990) 496 U.S. 1 [110 L.Ed.2d 1, 110 S.Ct. 2228]; *Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782].) Accordingly, we need not, and do not, address the possibility that such concerns might qualify as a statewide concern. (But see *Buckley* v. *Valeo, supra,* 424 U.S. at pp. 91-92 [46 L.Ed.2d at pp. 728-729].)

election campaigns is reasonably calculated to resolve that statewide concern; and (iii) therefore section 85300 addresses a statewide concern.

We have no reason to doubt petitioners' major premise; the integrity of the electoral process, at both the state and local level, is undoubtedly a statewide concern. The basis for this conclusion was well stated in an Attorney General opinion in 1960, in support of a conclusion that a charter city candidate is obligated to comply with statewide campaign financial disclosure provisions:

"Purity of all elections is a matter of statewide concern, not just a municipal affair. . . . The Legislature . . . has found that it is in the public interest that full and detailed disclosure be made of all contributions and expenditures in election campaigns. It was pointed out that such disclosure had a strong tendency to discourage excessive contributions and corrupt contributions . . . . [¶] So important is the independence and integrity of all elected officials that the reporting of campaign receipts and disbursements is the concern of the entire state as well as of the local communities [citations]. Elected officials of the various municipalities chartered and non-chartered throughout the state of California exercise a substantial amount of executive and legislative power over the people of the state of California, and this legislation aimed at obtaining the election of persons free from domination by self-seeking individuals or pressure groups is a matter of statewide concern." (35 Ops.Cal.Atty.Gen. 230, 231-232 (1960).)

Although we accept petitioners' major premise, we question their minor premise, that section 85300's ban on public financing of election campaigns is reasonably calculated to address the statewide concern regarding the integrity of the electoral process. We will consider that point in part IV,B,2b, below.

In conclusion, we reject petitioners' attempt to establish a statewide concern by pointing to: (i) the drafters' and voters' intent to establish a uniform rule pertaining to the financing of election campaigns; (ii) the asserted statewide interest in how local tax proceeds are spent; and (iii) an asserted legitimate statewide concern regarding the funding of political campaigns of candidates who are outside the mainstream of political thinking. We agree with petitioners however, that Proposition 73 may be read to identify "the integrity of the electoral process" as a legitimate statewide concern. We now address whether section 85300 is reasonably related and narrowly tailored to resolution of that statewide concern.

b. *Is Section 85300 Reasonably Related and Narrowly Tailored to the Resolution of a Matter of Statewide Concern?*

Petitioners cite nothing to support the proposition that section 85300's ban on public funding of political campaigns advances in any way the goal of enhancing the integrity of the electoral process. In fact, the opposite appears to be true. As the high court observed in *Buckley* v. *Valeo, supra,* 424 U.S. 1, concerning the federal "matching funds" program for Presidential candidates, "It cannot be gainsaid that public financing as a means of eliminating improper influence of large private contributions furthers a significant governmental interest. S. Rep. No. 93-689, pp. 4-5 (1974) [1974 U.S. Code Cong. & Admin. News, pp. 5590-5591]. In addition, the limits on contributions necessarily increase the burden of fundraising, and Congress properly regarded public financing as an appropriate means of relieving major-party Presidential candidates from the rigors of soliciting private contributions." (424 U.S. at p. 96 [46 L.Ed.2d at p. 731-732]; see also *Republican Nat. Committee* v. *Fed. Elec. Com'n* (S.D.N.Y. 1980) 487 F.Supp. 280, 285-286, 289.)[21]

The Court of Appeal below agreed: "[T]he use of public funds for campaign financing will not, almost by definition, have a corrupting influence. [Instead] . . . it seems obvious that public money reduces rather than increases the fund raising pressures on public office seekers and thereby reduces the undue influence of special interest groups. . . . [Moreover], the goals of campaign reform and reduction of election costs, including the reduction of the influence of special interest groups and large contributors, is in no way embarrassed by public financing. To the contrary, those goals can only be furthered. . . ."

To these observations we add the following. As explained above, the drafters of the Los Angeles charter amendment sought to create a measure that regulated not only campaign *contributions* (like Proposition 73), but that also imposed limits on *spending* by candidates. The drafters apparently realized that under *Buckley* v. *Valeo, supra,* 424 U.S. 1, spending limitations may not be imposed unless public financing is offered to and accepted by a candidate. (*Id.,* at pp. 54-59 [46 L.Ed.2d at pp. 707-710]; see especially *id.,* at p. 57, fn. 65 [46 L.Ed.2d at p. 709].) Accordingly, it appears the drafters

---

[21]The Senate Report cited in *Buckley* v. *Valeo, supra,* 424 U.S. 1, 96 [46 L.Ed.2d 659, 731-732], stated, inter alia: "In light of the record made before this Committee during its consideration of S. 372, and the hearing on the present legislation, it is clear to us that contribution and expenditure limits which would check excessive influence of great wealth cannot be effectively and fairly implemented without a comprehensive system of public campaign financing. . . ." (Sen. Rep. No. 93-689, p. 4 (1974) [1974 U.S. Code Cong. & Admin. News, p. 5591].)

provided for partial public financing of campaigns so that they could impose spending limitations consistently with *Buckley* v. *Valeo, supra.* It follows that, assuming spending limitations may enhance the integrity of the electoral process, a ban on public funding would actually frustrate achievement of that goal.

For all of the above reasons, we conclude section 85300 is not reasonably related to the statewide concern of enhancing the integrity of the electoral process. Having reached this conclusion, we need not address whether the statute is also narrowly tailored to avoid unnecessary incursion into legitimate areas of local concern.

## V. *Conclusion*

The judgment of the Court of Appeal is affirmed.

Panelli, J., Arabian, J., Baxter, J., and George, J., concurred.

**KENNARD, J.,** Concurring.—I agree with the majority and with Justice Mosk that Government Code section 85300 (hereafter section 85300), part of a 1988 initiative measure known as Proposition 73, does not invalidate Measure H, an ordinance of the City of Los Angeles. Although they agree on the result, the majority and Justice Mosk disagree on the proper legal ground of decision. I write separately to explain my own views on this disagreement.

In this case, petitioners maintain that Measure H conflicts with section 85300, and that because state law generally takes precedence over local enactments, this conflict must be resolved by declaring Measure H invalid. In defense of Measure H, this court has been presented with two separate and distinct theories. One of these theories is that Measure H prevails over conflicting state laws under the home rule provision of the California Constitution (art. XI, § 5) because it is a charter city ordinance addressing a purely municipal affair. The other theory is that section 85300 is itself invalid because it is not severable from other provisions of Proposition 73 that the Ninth Circuit has declared invalid on the ground that they violate the First and Fourteenth Amendments to the federal Constitution. (See *Service Emp. Intern.* v. *Fair Political Prac. Com'n* (9th Cir. 1992) 955 F.2d 1312.)

The majority upholds Measure H under the home rule theory without deciding whether section 85300 is severable from the provisions of Proposition 73 that the Ninth Circuit has declared invalid. Justice Mosk, on the other hand, would uphold Measure H under the theory that section 85300 is

nonseverable and therefore invalid, without addressing the home rule issue. I agree with the majority that this case is properly decided on the home rule theory without determining the validity of section 85300.

To decide which of the two alternative legal theories argued in this case should receive priority of consideration, I begin by recognizing that the judicial power to declare either a statute or an ordinance invalid should be exercised only when strictly necessary to decide an actual controversy.[1] This salutary principle serves to eliminate unnecessary friction between the legislative and judicial branches of government, and unnecessary interference with the electorate's right of initiative. In the words of the United States Supreme Court, exercise of the power to declare legislation invalid "is legitimate only in the last resort, and as a necessity in the determination of real, earnest, and vital controversy . . . ." (*Chicago Ry. Co.* v. *Wellman* (1892) 143 U.S. 339, 345 [36 L.Ed. 176, 179-180, 12 S.Ct. 400]; see also *Ashwander* v. *Valley Authority* (1936) 297 U.S. 288, 345 [80 L.Ed. 688, 709-710, 56 S.Ct. 466] (conc. opn. of Brandeis, J.); *Syrek* v. *California Unemployment Insurance Appeals Board* (1960) 54 Cal.2d 519, 526 [7 Cal.Rptr. 97, 354 P.2d 625].)

The most common basis for declaring a statute invalid is that it violates a constitutional provision. The principle that courts should avoid passing on the validity of statutes is thus related to, and frequently a particular application of, the broader principle that a court should decide a constitutional question only if it is absolutely necessary to do so. (*Rosenberg* v. *Fleuti* (1963) 374 U.S. 449, 451 [10 L.Ed.2d 1000, 1002-1003, 83 S.Ct. 1804]; *People* v. *Leonard* (1983) 34 Cal.3d 183, 187 [193 Cal.Rptr. 171 [666 P.2d 28]; *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000].)

One way that courts can avoid passing on the constitutional validity of a statute is to construe the statute in a manner that avoids conflict with constitutional restrictions on legislative power. Thus, when a court is asked to nullify a statute on the ground that it violates the state or federal Constitution, the court should " 'first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' " (*United States* v. *Thirty-Seven Photographs* (1971) 402 U.S. 363, 369 [28 L.Ed.2d 822, 829-830, 91 S.Ct. 1400].)

---

[1]Like most judicial rules, this one has an exception. A court may address the validity of a statute, notwithstanding an alternate basis of decision, when there is an urgent public need to resolve the validity question. (See *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 233 [149 Cal.Rptr. 239, 583 P.2d 1281].) The exception does not appear applicable to this case.

How do these principles apply in this case? Here we are asked to resolve a possible conflict between a state statute (§ 85300) and a charter city ordinance (Measure H). In *California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1991) 54 Cal.3d 1 [283 Cal.Rptr. 569, 812 P.2d 916], we said that the first step a court should take to resolve such a conflict is to "satisfy itself that the case presents an actual conflict between the two." (*Id.* at p. 16.) In other words, a court should determine first whether it is reasonably possible to construe the statute or the ordinance in a manner that reconciles the two and thereby avoids having to decide which takes precedence.

In this case, it is not reasonably possible to construe either section 85300 or Measure H in a manner that does not put them in conflict. Section 85300 prohibits public financing of political campaigns for elective office at all levels of government, while Measure H provides for partial public financing of municipal elections by local taxes. Because section 85300 and Measure H are irreconcilable, this court must decide which is to prevail.[2]

As I have stated, two distinct legal theories have been proposed in defense of Measure H: the theory that Measure H takes precedence over conflicting state law under the home rule provision of the state Constitution (art. XI, § 5) and the theory that Measure H prevails because section 85300 is not severable from other provisions of Proposition 73 that the Ninth Circuit has struck down as violative of the federal Constitution.

As Justice Mosk points out in his concurring and dissenting opinion, the home rule theory requires us to address a question of constitutional magnitude by interpreting and applying the home rule provision of the state Constitution, and in so doing requires us to decide whether a law—Measure H—should be declared invalid. But the nonseverability theory requires us to address questions of at least equal gravity. To address that theory, this court would have to decide whether section 85300 is invalid because it is part of an initiative measure, Proposition 73, that the Ninth Circuit has found to violate the federal Constitution by invidiously discriminating in favor of incumbents and against other candidates for elective office. (See *Service Emp. Intern.* v. *Fair Political Prac. Com'n, supra,* 955 F.2d 1312.) This analysis would also require us to consider constitutional questions and to decide whether a law—section 85300—should be declared invalid.

Because we must rule on the validity of a legislative enactment under either theory, and because constitutional questions are implicated under

---

[2]The majority declines to decide whether there is an actual conflict between Measure H and section 85300 because it believes that to do so would require it to determine whether "section 85300 has been rendered inoperative as a result of proceedings in federal court." (Maj. opn., *ante,* at pp. 400-401.) I do not agree. In my view, the actual conflict inquiry goes only to the interpretation, not the validity, of the assertedly conflicting provisions.

either theory, the majority has violated no principle of judicial practice by giving priority of consideration to the home rule theory rather than the severability theory.[3] Indeed, under the principles of judicial practice previously mentioned, addressing the home rule theory appears to be preferable because the validity determination under that theory affects only a local ordinance, whereas the validity determination under the severability theory affects a state law, and because in upholding Measure H under the home rule theory we invalidate neither the local nor the state law.

**MOSK, J.,** Concurring and Dissenting.—For reasons that remain obscure to me, the majority have gone to the trouble of rendering an advisory opinion on the question whether a city charter provision conflicts with a state statute. The statute was part of a state initiative measure that has been declared essentially a "dead letter" on federal constitutional grounds by the Ninth Circuit Court of Appeals.

This is the second advisory opinion that has sprouted while we delayed recognizing the federal courts were in the process of striking down this initiative measure. (See *Taxpayers to Limit Campaign Spending* v. *Fair Pol. Practices Com.* (1990) 51 Cal.3d 744, 774 [274 Cal.Rptr. 787, 799 P.2d 1220] (conc. and dis. opn. of Mosk, J.).) As I will demonstrate, the portion of the measure remaining after the federal courts finished dining on it would not have appealed to the voters. The minor section relied upon by petitioners must be invalidated along with the crucial portion of the measure invalidated by the federal courts. The result is that there is no valid statute with which the city charter can possibly conflict.

I

First, the matter of the advisory opinion. Petitioners seek to invalidate a city charter provision for partial public funding of campaigns for city elective offices. They argue that the charter provision conflicts with a state statute regulating a matter of statewide concern, and must be invalidated as a matter of state constitutional law. The statute, Government Code section 85300, was enacted as part of Proposition 73 on the June 1988 ballot, a statewide initiative measure that imposed limitations on campaign contributions and banned public financing of election campaigns.[1]

Before we can reach the question whether the municipal affairs doctrine of the state Constitution permits the city to regulate election finance in a

---

[3]For this reason, I do not agree with Justice Mosk's characterization of the majority's analysis of the home rule theory as an advisory opinion.

[1]All statutory references are to the Government Code unless otherwise indicated.

manner contrary to that provided by a statewide law, we normally would consider an important threshold matter. Is the statewide law valid? Is a severable portion of the initiative measure still state law? If not, the issue of the municipal affairs doctrine is moot and anything we say about it is an advisory opinion. This is the sequence of reasoning followed by the Court of Appeal.

Instead, the majority posit that because the city charter prevails both if the statewide law is invalid and under the municipal affairs doctrine, we should decide the municipal affairs question. They note also that the parties want us to decide the question, we granted review for that purpose, the briefing is good, and we have another vehicle for considering the validity of Proposition 73. (Maj. opn., *ante*, pp. 400-401.)

We do not decide moot issues unless they are of continuing public importance and are likely to recur. (*O'Hare* v. *Superior Court* (1987) 43 Cal.3d 86, 91, fn. 1 [233 Cal.Rptr. 332, 729 P.2d 766]; *Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 141 [137 Cal.Rptr. 14, 560 P.2d 1193]; *Liberty Mut. Ins. Co.* v. *Fales* (1973) 8 Cal.3d 712, 715-716 [106 Cal.Rptr. 21, 505 P.2d 213].) The question of conflict between municipal charters and section 85300 is not likely to recur—not even once. Section 85300 must be invalidated, so the question of conflict with it simply will not come up again.

The majority cite one case in which we reached a moot question of public import without meeting the requirement that the issue be likely to recur. (*United Farm Workers of America* v. *Superior Court* (1976) 16 Cal.3d 499, 503-504 [128 Cal.Rptr. 209, 546 P.2d 713] [hereafter *United Farm Workers*].) But we simply omitted explicit discussion of the requirement; the authority we cited for the proposition that a reviewing court may retain an otherwise moot case if it is of sufficient public importance did state the requirement that the issue be a recurring one. (*Gordon* v. *Justice Court* (1974) 12 Cal.3d 323, 326, fn. 1 [115 Cal.Rptr. 632, 525 P.2d 72, 71 A.L.R.3d 551].) Obviously, the issue before us in *United Farm Workers, supra,* 16 Cal.3d 499, that is, whether a class action will lie to restrain a labor union's picketing activities, *was* likely to recur. To rely on *United Farm Workers* for the proposition that a moot issue may be decided though it is unlikely to recur would be to violate the axiom that cases are not authority for propositions not considered therein. (*People* v. *Toro* (1989) 47 Cal.3d 966, 978, fn. 7 [254 Cal.Rptr. 811, 766 P.2d 577]; *People* v. *Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7 [82 Cal.Rptr. 724, 462 P.2d 580].)

There is another reason that the majority err in taking on the municipal affairs issue in this case. " '[W]e do not reach constitutional questions unless

absolutely required to do so to dispose of the matter before us.' " (*In re Michael G.* (1988) 44 Cal.3d 283, 295 [243 Cal.Rptr. 224, 747 P.2d 1152], quoting *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000]; see also *Whitman* v. *Superior Court* (1991) 54 Cal.3d 1063, 1074 [2 Cal.Rptr.2d 160, 820 P.2d 262]; *Cumero* v. *Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 586 [262 Cal.Rptr. 46, 778 P.2d 174]; *People* v. *Marsh* (1984) 36 Cal.3d 134, 144 [202 Cal.Rptr. 92, 679 P.2d 1033]; *Palermo* v. *Stockton Theaters, Inc.* (1948) 32 Cal.2d 53, 65-66 [195 P.2d 1]; and other authorities too numerous to mention.) The United States Supreme Court, too, observes restraints against "unnecessary constitutional decisions." (*Ellis* v. *Railway Clerks* (1984) 466 U.S. 435, 444-445 [80 L.Ed.2d 428, 439-440, 104 S.Ct. 1883].) Not only are we not required to take on the constitutional question decided by the majority; in fact, the question is moot.

II

On the June 1988 General Election ballot there appeared Proposition 73, a measure that proposed to add a chapter containing four articles to the Government Code. Article 1 provided a number of definitions of terms and disclaimers, and a full title of the chapter, as follows: "Campaign Contribution Limits Without Taxpayer Financing Amendments to the Political Reform Act." (§ 85100.) Article 2 provided for campaign contribution trust accounts, to be limited in amount as provided by article 3. (§ 85201.) It also provided that a candidate may accept contributions only from "persons, political committees, broad based political committees, and political parties" as defined in article 1. (§ 85202.) Article 3, the red meat of the proposition, prohibited the expenditure or acceptance of public funds for the purpose of seeking elective office. (§ 85300.) In proposed sections 85301 to 85303 it also established limits on campaign contributions of individuals, "political committees," and "broad based political committees" during any fiscal year. In proposed section 85304 it prohibited transfers of funds between candidates. Proposed section 85305 applied fiscal year contribution limitations to special elections and special runoff elections. Article 4 limited honoraria, prohibited mass mailings at public expense, and supplied a severability clause.

The Ninth Circuit Court of Appeals has affirmed the decision of the federal district court invalidating the limitations imposed by Proposition 73 on campaign contributions. (*Service Emp. Intern.* v. *Fair Political Prac. Com'n* (9th Cir. 1992) 955 F.2d 1312, cert. den. __ U.S. __ [120 L.Ed.2d 922, 112 S.Ct. 3056].) Because the proposition limited contributions during any *fiscal* year, rather than, for example, during the election cycle, the

contribution limits were unconstitutional "in the First Amendment context" because they invidiously discriminated in favor of incumbents and against challengers. (955 F.2d at pp. 1319-1321.) The court noted that the issue could be analyzed either under the First Amendment or the equal protection clause of the Fourteenth Amendment, with the same result. (955 F.2d at p. 1319, fn. 11.) The Court of Appeals also agreed with the district court that the fiscal year element of the campaign contribution limitations was not severable, despite a severability clause. The court explained that no reason had been provided to convince it that " 'the legislation would have been enacted if it had not included the unconstitutional provision.' " (955 F.2d at p. 1321.) An annual accounting would still be required even if the "fiscal year" language were stricken, and the court could not substitute other language without substantially rewriting the legislation. (*Ibid.*)

The reviewing court agreed that Proposition 73 also imposed an unconstitutional expenditure limitation because, in prohibiting inter- and intracandidate transfers of funds, it limited the purposes for which money raised by a candidate may be spent. "Expenditure limitations are subject to strict scrutiny and will be upheld only if they are 'narrowly tailored to serve a compelling state interest.' " (*Service Emp. Intern.* v. *Fair Political Prac. Com'n, supra,* 955 F.2d at p. 1322.) The limitations imposed by Proposition 73 failed to survive strict scrutiny. Finally, the court agreed that the proposition's limitation on the use of funds collected prior to its operative date could not survive the demise of the contribution limitation provisions of the enactment. (955 F.2d at p. 1323.)

Neither the district court nor the Court of Appeals was called upon to address the question whether the prohibition on the use of public funds contained in Proposition 73 was severable from the invalidated portions of the enactment. It is this provision, section 85300, that vexes us in this case.[2]

In *CalFarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 821 [258 Cal.Rptr. 161, 771 P.2d 1247], we explained that "[t]he cases prescribe three criteria for severability: the invalid provision must be grammatically, functionally and volitionally separable." (*Id.* at pp. 821-822.) The first two criteria are met in this case; the only question concerns the last criterion. A Court of Appeal decision upon which we relied in *CalFarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d 805, admirably defines the volitional element: "[T]he provisions to be severed must be so presented to the electorate in the initiative that their significance may be seen and independently evaluated in the light of the assigned purposes of the enactment. The test is whether it can

---

[2]Section 85300 provides: "No public officer shall expend and no candidate shall accept any public moneys for the purpose of seeking elective office."

be said with confidence that the electorate's attention was sufficiently focused upon the parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions." (*People's Advocate, Inc.* v. *Superior Court* (1986) 181 Cal.App.3d 316, 332-333 [226 Cal.Rptr. 640].)

Proposition 73 contains a severability clause.[3] " 'Although not conclusive, a severability clause normally calls for sustaining the valid part of the enactment, especially when the invalid part is mechanically severable. . . .' . . . Such a clause plus the ability to mechanically sever the invalid part while normally allowing severability, does not conclusively dictate it. The final determination depends on whether 'the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute.' . . . or 'constitutes a completely operative expression of the legislative intent . . . [and is not] so connected with the rest of the statue as to be inseparable.' " (*Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 331 [118 Cal.Rptr. 637, 530 P.2d 605], quoted with approval in *CalFarm Ins. Co.* v. *Deukmejian, supra*, 48 Cal.3d at p. 821.)

Though I have no crystal ball, it is highly unlikely that the electorate would have enacted the ban on public financing in the absence of the campaign finance reform provisions invalidated by the federal courts. Thus, for instance, the title of the measure inextricably linked the two concepts, calling for "Campaign Contribution Limits *Without* Public Taxpaxer Financing." (§ 85100, italics added.) Both articles 2 and 3 contain references to both elements, that is, to both limits on the amount of campaign contributions and to the restriction of the source of campaign contributions to the private sphere. (§§ 85202, 85300, 85301-85303.) Further, the ballot arguments link the two elements, promising—with capital letter emphasis—that "Proposition 73 will reform the way political campaigns are financed in California WITHOUT GIVING YOUR TAX MONEY TO POLITICIANS!" and that the proposition "ACCOMPLISHES THIS NEEDED REFORM OF CAMPAIGN FINANCING WITHOUT GIVING YOUR HARD-EARNED TAX MONEY TO POLITICIANS." (Ballot Pamp., argument in favor of Prop. 73 as presented to the voters, Gen. Elec. (June 7, 1988) p. 34, emphasis and capitalization in original.)

In no way was the prohibition against public funding presented as an end in itself. In fact California had no public funding of elections at the statewide

---

[3]The clause provides: "If any provision of this act, or the application of any such provision to any person or circumstances shall be held invalid, the remainder of this act to the extent it can be given effect, or the application of those provisions to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby, and to this end the provisions of this act are severable." (Prop. 73, Gen. Elec. (June 7, 1988).)

level, as the Legislative Analyst explained to the voters in connection with Proposition 73. (Ballot Pamp., *supra*, analysis of Prop. 73 by the Legislative Analyst, p. 32.) It would have been quite unnecessary, therefore, to entertain an independent purpose of prohibiting state financing of elections.

While portions of the argument of the proponents of Proposition 73 were devoted to persuading the voters, for example, that "TAXPAYER FINANCING OF POLITICAL CAMPAIGNS MAKES NO SENSE" (Ballot Pamp., *supra*, argument in favor of Prop. 73, p. 34, capitalization in original), the argument was directed at a competing initiative, not at establishing the independent need for a ban on public financing. At the same election, the voters were offered Proposition 68, an initiative measure providing for campaign finance reform with partial public financing. The proponents of Proposition 73 offered their package of reform with no public financing as an alternative. Again, there is no indication at all that the prohibition against public financing was seen as an end in itself, even by the proponents of Proposition 73. Such an end would have been particularly pointless, as the state had no public financing of statewide elections—unless the rival reform package were to be enacted.

I acknowledge that the Court of Appeal in this case reached a different conclusion, finding the prohibition of public financing severable from the portions of Proposition 73 held invalid by the federal courts. The Court of Appeal turned to the other campaign finance reform measure on the June 1988 ballot, Proposition 68, which prevailed by a narrower margin than Proposition 73. Proposition 68 also contained campaign funding reform, but with spending limits, and as I have noted, some public funding. The Court of Appeal surmised that because fewer voters approved Proposition 68 than approved Proposition 73, the majority of voters were opposed to public funding of campaigns. The Court of Appeal concluded: "If any conclusion can confidently be drawn from the election which resulted in the approval of both . . . propositions, but with different majorities, it is that the voters wanted extensive campaign financing reform but that they did not want to do it with public money. We have no trouble concluding that had the voters known that some of Proposition 73's contribution . . . limitations might be held invalid, they nonetheless would have supported the proscription on public financing."

The voters may have wanted "extensive campaign finance reform," but they are not going to get it from Proposition 73, as all the finance reform provisions have been invalidated by the federal courts.[4] The question whether we can be confident that the voters would have wanted a prohibition

[4] The other provisions not reached by the federal courts limited honoraria for incumbents and eliminated free mass mailings by incumbents (previously permitted up until the time of

against public funding, alone, without any campaign finance reform, remains unanswered in the Court of Appeal opinion. As I see the two elements as inextricably intertwined in the text of the proposition and the ballot arguments, I would hold section 85300 not severable.

That Proposition 73 was offered to the voters as a package deal, and not a smorgasbord, has already been confirmed by this court in another context. In *Taxpayers to Limit Campaign Spending* v. *Fair Pol. Practices Com.*, *supra*, 51 Cal.3d 744, we refused to parse the terms of Propositions 73 and 68 to find an amalgam that we thought would have been palatable to the majority of voters. We were persuaded that Proposition 73 was intended as an all-or-nothing alternative to Proposition 68; a whole, and not a sum of parts. "We conclude that, unless a contrary intent is apparent in the ballot measures, when two or more measures are competing initiatives, either because they are expressly offered as 'all-or-nothing' alternatives or because each creates a comprehensive regulatory scheme related to the same subject, [the state Constitution] mandates that only the provisions of the measure receiving the highest number of affirmative votes be enforced." (51 Cal.3d at p. 747.)

We clearly viewed Proposition 73 as a package offering in *Taxpayers to Limit Campaign Spending* v. *Fair Pol. Practices Com.*, *supra*, 51 Cal.3d 744. To remain consistent with our position in that case, we should refuse to find the ban on public finance contained in Proposition 73 severable.

### III

As section 85300 falls with the provisions invalidated by the federal courts, petitioners' argument that the Los Angeles charter provision is invalid because it conflicts with section 85300 must fail. As I have said before in a similar context, "[a] dead horse cannot win a race." (*Taxpayers to Limit Campaign Spending* v. *Fair Pol. Practices Com.*, *supra*, 51 Cal.3d at p. 774 (conc. and dis. opn. of Mosk, J.).)

I would affirm the judgment of the Court of Appeal discharging the alternative writ, denying the peremptory writ of mandate, and dissolving the

filing to run for reelection). These are not directly related to campaign finance reform, but are more in the nature of limitations on the perquisites of office. Also not discussed were provisions dealing with the bank accounts in which funds were to be placed. These were not separate reforms, but a method of enforcing the contribution limits that have been declared unconstitutional. Further, the voters' attention obviously was not focused on the accounting provisions as a separate reform; the accounting element of the proposition was not mentioned in the Attorney General's summary, the Legislative Analyst's analysis, or the arguments of the proponents or opponents.

temporary stay, but for the reasons I have stated, and not for the reasons set forth in the majority opinion.