54 Cal.Rptr.3d 698 (2007)
147 Cal.App.4th 891
Daniel HERNANDEZ, Plaintiff and Respondent,
v.
CITY OF SACRAMENTO et al., Defendants and Appellants.
No. C047180.
Court of Appeal of California, Third District.
February 15, 2007.
*699 Samuel L. Jackson, City Attorney, and H. Michon Johnson, Senior Deputy City Attorney, for Defendants and Appellants.
*700 Mark T. Clausen for Plaintiff and Respondent.
RAYE, J.
Can Sacramento, a charter city, dilute the procedural protections accorded by state laws to those who forfeit the vehicles they allegedly used to facilitate prostitution or various drug transactions? We conclude that because the state laws fully occupy the fields of vehicle forfeiture involving prostitution and drug transactions, areas of statewide concern, they preempt Sacramento's nuisance ordinance that, unlike state law, allows proof by a preponderance of the evidence, does not require a criminal conviction, does not protect innocent owners of the vehicle, and provides none of the guidelines "to ensure the proper utilization of the laws permitting the seizure and forfeiture of property." (Health & Saf.Code, § 11469; all further statutory references are to the Health and Safety Code unless otherwise indicated.) We affirm.

FACTS
The popularity of civil asset forfeiture laws began with the federal government in the 1970's (Pub.L. No. 91-513 (Oct. 27, 1970) 84 Stat. 1276 [the relevant portion affecting civil forfeiture is codified at 21 U.S.C. 881]) and 1980's (28 U.S.C. 524), gained fashion in California at the state level in the late 1880's (Health & Saf.Code, § 11469 et seq.; People v. $31,500 United States Currency (1995) 32 Cal.App.4th 1442, 1447, 38 Cal.Rptr.2d 836), and more recently spread to urban municipalities throughout the state (see, e.g., Horton v. City of Oakland (2000) 82 Cal.App.4th 580, 98 Cal.Rptr.2d 371 (Horton)). Civil forfeitures are actions in rem intended to be remedial in nature "`by removing the tools and profits' from persons engaged in the illicit drug trade." (People v. Superior Court (Plascencia) (2002) 103 Cal.App.4th 409, 418, 430, 126 Cal.Rptr.2d 793 (Plascencia), quoting § 11469, subd. (j).) Federal, state, and municipal law enforcement agencies share the proceeds according to varying formulas exacted by each jurisdiction. In this labyrinth of forfeiture laws, we are concerned only with the compatibility of Sacramento's forfeiture ordinance (Sacramento Mun.Code, ch. 8.14) with state laws (§ 11469 et seq.).
California's civil asset forfeiture laws have endured a tortuous history. (People v. Nazem (1996) 51 Cal.App.4th 1225,1231, 59 Cal.Rptr.2d 794.) The Legislature enacted a drug asset forfeiture law in 1972, and the first wholesale revision to the law was not made until 1987. (See Stats.1987, .ch. 924, p. 3109.) Under this law, "forfeiture proceedings were tied to the underlying criminal charges in that a conviction was generally required as a prerequisite to forfeiture, and the same jury which rendered the conviction was required to hear the forfeiture issue." (Mundy v. Superior Court (1995) 31 Cal.App.4th 1396, 1400, 37 Cal.Rptr.2d 568 (Mundy).) The sunset provision included in the law provided it would expire on January 1, 1989, unless it was extended by subsequent legislation enacted before it expired.
The next iteration of the law was passed the following year (see Stats.1988, ch. 1492, p. 5285) "to bring California's drug asset forfeiture provisions more closely in line with the federal asset forfeiture statutes. (Assem.3d reading of Assem. Bill No. 4162 (1988 Reg. Sess.) (May 11, 1988) p. 5.) It was hoped that with fewer procedural hurdles to overcome, state officials would be disinclined to turn major drug cases over to federal authorities and more seized assets would stay in California. [Citation.]" (Mundy, supra, 31 Cal. App.4th at pp. 1400-1401, 37 Cal.Rptr.2d 568.) Thus, the 1988 law "eliminated the *701 requirement of a criminal conviction and lessened the state's burden of proof to a preponderance of the evidence." (Id. at p. 1401, 37 Cal.Rptr.2d 568.) Known as the Katz forfeiture law after the author of the legislation, the law became effective January 1,1989, and included a five-year sunset provision. (Stats.1988, ch. 1492, § 16, p. 5298.) The law was amended again in 1990 and 1991. (Mundy, supra, 31 Cal. App.4th at p. 1401, 37 Cal.Rptr.2d 568.)
The Katz forfeiture law expired on January 1, 1994, but in August of that year the Legislature enacted comprehensive reforms designed to permit forfeiture while ameliorating the effects on property owners and protecting their constitutional rights. (See § 11469.) "[T]he 1994 amendments to California's statutory scheme imposed very different burdens of proof on the government and the claimant than did the analogous federal forfeiture law then in effect. The current version of the California forfeiture statute requires that the government prove the owner of an interest in the property knowingly consented to the illicit use of the property, either beyond a reasonable doubt or by clear and convincing evidence, depending upon the nature of the property involved. (§§ 11488.4, subd. (i), 11488.5, subd. (d)(1).) In contrast, prior to the passage of the federal Civil Asset Forfeiture Reform Act of 2000,18 United States Code section 983, the federal drug forfeiture statute `tilted heavily in the government's favor.'" (Plascencia, supra, 103 Cal.App.4th at p. 432, 126 Cal.Rptr.2d 793.) Thus, many of the procedural protections accorded under the 1987 law were restored under the 1994 amendments. (Mundy, supra, 31 Cal. App.4th at pp. 1401-1402, 37 Cal.Rptr.2d 568.)
Sections 11469 through 11495 regulate drug-related asset forfeiture, including the forfeiture of vehicles. The statutes contain stringent substantive and procedural conditions for the civil forfeiture of a vehicle used in the commission of a specified controlled substance offense. (Ibid.) They delineate at some length and in specific detail the purpose, scope, and procedures of seizure and forfeiture, and the permissible uses to which the proceeds may be put, including:
(1) what drug-related offenses are covered, the quantity of drugs required, and the types of property subject to forfeitureincluding vehicles (§ 11470);
(2) the evidentiary showing that must be made to secure forfeitureincluding a criminal conviction for vehicle forfeitures (§ 11488.4, subd. (i));
(3) which vehicle owners are exempted from forfeiture, such as `innocent owners,' employers, spouses, and common carriers (§§ 11470, subds.(e) & (g), 11488.5, subd. (e), 11488.6 & 11490);
(4) the manner in which proceeds of forfeiture are to be distributed (§ 11489);
(5) the permissible uses to which the proceeds may be put and the accounting methods required to ensure that the pecuniary interests of law enforcement and prosecutors do not interfere with the proper enforcement of the statutes and the due process rights of property owners (§§ 11469,11489); and
(6) the protection of the interests of encumbrancers, bona fide purchasers, and certain community property interests (§ 11470, subds.(e) & (h)).
Unlike the Sacramento forfeiture ordinance, these provisions include the requirement of a criminal conviction, proof beyond a reasonable doubt of the conditions justifying forfeiture, and the protection of innocent parties who hold an interest in the vehicle. (§§ 11470,11488.4.)
*702 In 1993 the Legislature also expressly found that vehicles were often used to solicit prostitution. It thereby established a five-year pilot program "to ascertain whether declaring motor vehicles a public nuisance when used in the commission of acts of prostitution would have a substantial effect upon the reduction of prostitution in neighborhoods, thereby serving the local business owners and citizens of our urban communities." (Stats.1993, ch. 485, § 1, pp. 2595-2596; Veh.Code, § 22659.5.)
In 1997 the City of Oakland enacted an ordinance authorizing the seizure, forfeiture, and sale of vehicles used to solicit prostitution or acquire drugs "after citizens complained about the nuisance created by persons driving through neighborhoods to buy drugs or solicit acts of prostitution." (Horton, supra, 82 Cal. App.4th at p. 584, 98 Cal.Rptr.2d 371.) In Horton, the First District Court of Appeal rejected a preemption challenge, thereby giving the green light to municipalities throughout the state to enact copycat ordinances. (Id. at pp. 588, 591, 98 Cal.Rptr.2d 371.)
Sacramento followed Oakland's lead. It, too, enacted a nuisance ordinance to rid its residential neighborhoods of the blight associated with prostitution and drug buying. Chapter 8.14 permits a vehicle used to solicit prostitution or to purchase or attempt to purchase drugs to be seized as a nuisance and forfeited to abate the nuisance. (Sacramento Mun.Code, §§ 8.14.020, 8.14.030.) A court or jury need only find by a preponderance of the evidence that one predicate offense has been committed to order a forfeiture. (Sacramento Mun.Code, § 8.14.060(E).) The ordinance does not require the offender to be convicted before forfeiture occurs or that the forfeiture be proportional to the gravity of the offense. There are no exceptions provided for "innocent owners," spouses, employers, or common carriers.
Forfeiture proceeds under the ordinance are distributed as follows: (1) a completely discretionary allocation to a "bona fide or innocent purchaser, conditional sales vendor, mortgagee or lien holder of the [vehicle]"; (2) a mandatory distribution to the city attorney and Sacramento Police Department to reimburse them for their respective costs of enforcement; and (3) all remaining funds are divided equally between the city attorney and Sacramento Police Department. (Sacramento Mun. Code, § 8.14.070.) The ordinance provides no requirements or prohibitions with respect to the use of the proceeds.
In December 2002 Daniel Hernandez, a taxpayer, filed the underlying action to enjoin enforcement of the Sacramento nuisance vehicle abatement ordinance. Hernandez acknowledged that Horton foreclosed his preemption claim. The trial court granted summary adjudication of a single cause of action for declaratory and injunctive relief, finding the ordinance unconstitutional. We asked for additional briefing on the preemption issue, and the parties settled all issues raised in this appeal with the exception of preemption.1 We conclude that state laws preempt local regulation of vehicle forfeiture thinly disguised as nuisance ordinances, and on this basis alone, we affirm the judgment.

DISCUSSION

I

General Principles Governing State Preemption
In allocating power between state and municipal governments, the California *703 Constitution preserves an historical preference for resolving problems locally. "In the absence of state preemption, every municipality is authorized by the California Constitution to exercise its police power to deal with local situations." (California Rifle & Pistol Assn. v. City of West Hollywood (1998) 66 Cal.App.4th 1302, 1307-1308, 78 Cal.Rptr.2d 591 (California Rifle).) Article XI, section 5, embodying the "home rule" doctrine, reserves to charter cities the authority to adopt and enforce "all ordinances and regulations in respect to municipal affairs" even if they conflict with state laws. (Fisher v. City of Berkeley (1984) 37 Cal.3d 644, 704 & fn. 63, 209 Cal.Rptr. 682, 693 P.2d 261.) Clearly, drug abuse and prostitution within city boundaries are matters of municipal concern. The question presented, therefore, is not whether the Legislature has bestowed upon charter cities the power to enact forfeiture laws targeting drug abuse and prostitution. Rather, the question is whether the Legislature has expressly or impliedly preempted the field in a matter of statewide concern.
To resolve a preemption challenge to a charter city ordinance, we must ask two questions: does the ordinance actually conflict with state law, and if so, does the subject matter involve a municipal affair or one of statewide concern? (Barajas v. City of Anaheim (1993) 15 Cal.App.4th 1808, 1813, 19 Cal.Rptr.2d 764 (Barajas).) Sacramento urges us to address the second question first because, in Sacramento's view, nuisance abatement is exclusively a municipal affair. We need not, however, become arbiters between the state and a charter city unless there is an actual conflict between state law and a municipal ordinance. (California Fed. Savings & Loan Assn. v. City of Los Angeles (1991) 54 Cal.3d 1, 16-17, 283 Cal.Rptr. 569, 812 P.2d 916 (California Fed Savings & Loan).) Hernandez insists, and we agree, the ordinance is not exempt from careful scrutiny merely because Sacramento has styled it as nuisance abatement rather than forfeiture.
"A conflict between state law and an ordinance exists if the ordinance duplicates or is coextensive therewith, is contradictory or inimical thereto, or enters an area either expressly or impliedly fully occupied by general law." (American Financial Services Assn. v. City of Oakland (2005) 34 Cal.4th 1239, 1251, 23 Cal. Rptr.3d 453, 104 P.3d 813 (American Financial).) Hernandez contends that the Legislature has fully occupied the field of vehicle forfeitures involving both prostitution and drug transactions. In spite of the Legislature's failure to expressly preempt supplementary municipal regulation, Hernandez urges us to divine a clear indication of intent to preempt from the purpose and scope of state laws.
The Supreme Court has identified three indicia of an implied legislative intent to fully occupy the field: "`(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality [citations]." (Sherwin-Williams Co. v. City of Los Angeles (1993) 4 Cal.4th 893, 898, 16 Cal.Rptr.2d 215, 844 P.2d 534.)
When judges are forced to guess whether state legislators impliedly meant to preclude local legislators from crafting *704 local solutions to their constituents' problems, they must engage in a systematic and measured assessment of the purpose and scope of the state legislative scheme. "Where the Legislature has adopted statutes governing a particular subject matter, its intent with regard to occupying the field to the exclusion of all local regulation is not to be measured alone by the language used but by the whole purpose and scope of the legislative scheme." (Tolman v. Underhill (1952) 39 Cal.2d 708, 712, 249 P.2d 280.) As Chief Justice George aptly pointed out in his dissent in American Financial, "those municipal ordinances that have been found to be preempted have been seen as subverting, in some tangible way, the purpose and intent of the state statute." {American Financial, supra, 34 Cal.4th at p. 1272, 23 Cal.Rptr.3d 453,104 P.3d 813.)

II

Drug-Related Forfeiture Laws

A. Does the Sacramento Ordinance Actually Conflict With State Forfeiture Laws?
We recognize that precedent often provides more rationalization than standards for assessing whether the Legislature has fully occupied a field (Gluck v. County of Los Angeles (1979) 93 Cal. App.3d 121, 132, 155 Cal.Rptr, 435) and that naming the field is subject to result-oriented manipulation (Tri County Apartment Assn. v. City of Mountain View (1987) 196 Cal.App.3d 1283, 1294-1295, 242 Cal.Rptr. 438 (Tri County)). To avoid these pitfalls and to systematically assess whether the Legislature impliedly occupied the field, we subject our analysis to three pointed inquiries:
1. Does the ordinance conflict with a general legislative declaration of policy? (Chavez v. Sargent (1959) 52 Cal.2d 162, 177, 339 P.2d 801, disapproved on other grounds in Petri Cleaners, Inc. v. Automotive Employees, etc., Local No. 88 (1960) 53 Cal.2d 455, 473-74, 2 Cal. Rptr. 470, 349 P.2d 76.)
2. Does the subject require uniform treatment throughout the state? (Tri County, supra, 196 Cal.App.3d at p. 1294, 242 Cal.Rptr. 438.)
3. Is the state regulation so complete and detailed as to indicate an intent to preclude local regulation? (Suter v. City of Lafayette (1997) 57 Cal.App.4th 1109, 1126, 67 Cal.Rptr.2d 420; Northern Cat. Psychiatric Society v. City of Berkeley (1986) 178 Cal.App.3d 90, 99, 223 Cal.Rptr. 609.)

I. Declaration of Policy
Acutely aware of the danger of the financial incentives sanctioned by the forfeiture laws, the Legislature declared that potential revenue was not to jeopardize the integrity of criminal investigations or the due process rights of citizens. (§ 11469, subd.(a).) The Legislature expressly set forth nine specific guidelines to ensure compliance with the carefully constructed policy balancing enforcement of drug laws and the due process rights of property owners, including innocent persons with an interest in the forfeited vehicles. (§ 11469, subds.(b)-(j).)
Thus, section 11469 provides as follows: "In order to ensure the proper utilization of the laws permitting the seizure and forfeiture of property under this chapter, the Legislature hereby establishes the following guidelines: [1] (a) Law enforcement is the principal objective of forfeiture. Potential revenue must not be allowed to jeopardize the effective investigation and prosecution of criminal offenses, officer Safety, the integrity of ongoing investigations, or the due process rights of citizens. [¶] (b) No *705 prosecutor's or sworn law enforcement officer's employment or salary shall be made to depend upon the level of seizures or forfeitures he or she achieves. [¶] (c) Whenever appropriate, prosecutors should seek criminal sanctions as to the underlying criminal acts which give rise to the forfeiture action. [¶] (d) Seizing agencies shall have a manual detailing the statutory grounds for forfeiture and all applicable policies and procedures. The manual shall include procedures for prompt notice to interest-holders, the expeditious release of seized property, where appropriate, and the prompt resolution of claims of innocent ownership. [¶] (e) Seizing agencies shall implement training for officers assigned to forfeiture programs, which training should be ongoing. [¶] (f) Seizing agencies shall avoid any appearance of impropriety in the sale or acquisition of forfeited property. [¶] (g) Seizing agencies shall not put any seized or forfeited property into service. [¶] (h) Unless otherwise provided by law, forfeiture proceeds shall be maintained in a separate fund or account subject to appropriate accounting controls and annual financial audits of all deposits and expenditures. [¶] (i) Seizing agencies shall ensure that seized property is protected and its value preserved. [¶] (j) Although civil forfeiture is intended to be remedial by removing the tools and profits from those engaged in the illicit drug trade, it can have harsh effects on property owners in some circumstances. Therefore, law enforcement shall seek to protect the interests of innocent property owners, guarantee adequate notice and due process to property owners, and ensure that forfeiture serves the remedial purpose of the law."

2. Uniform Treatment Throughout the State
In ascertaining whether the drug-related vehicle forfeiture statute preempts municipal regulation, we must next examine whether the subject requires uniform treatment throughout the state. (In re Lane (1962) 58 Cal.2d 99, 111, 22 Cal.Rptr. 857, 372 P.2d 897 (cone. opn. of Gibson, C.J.).) Sacramento claims that it responded to the unique complaints of its citizens to remove blight from their neighborhoods. We find little, if any, evidence in this record to document that Sacramento's problems differ to any significant extent from those of other cities, and such a proposition is particularly suspect given the number and similarity of the municipal ordinances enacted by local governments throughout the state. (See, e.g., Horton, supra, 82 Cal.App.4th at p. 584, 98 Cal. Rptr.2d 371; Stockton Mun.Code, ch. 5, part XXV, Seizure and Forfeiture of Nuisance Vehicles, § 5-1000 et seq.) Moreover, Sacramento would have us believe that the Legislature intended to permit ordinances allowing forfeiture of a vehicle where an alleged petty drug buyer is acquitted but to require a serious drug dealer to be convicted before forfeiting a vehicle. Similarly, Sacramento's argument implies that the Legislature envisioned local ordinances that provide no exemptions for innocent owners when their vehicles are used to buy a small amount of drugs while exempting those innocent owners whose vehicles were used to sell large amounts of drugs.
The court in Horton held that the Legislature's failure to expressly include drug buyers within the drug-related forfeiture statute meant it failed to fully occupy the field and did not preclude ordinances tailor-made for individual communities. (Horton, supra, 82 Cal.App.4th at pp. 586-587, 98 Cal.Rptr.2d 371.) The court rejected the notion that the exclusion was intentional and consistent with the Legislature's objective to restrain law enforcement *706 and limit forfeiture to the bigger players in the drug trade. (Ibid.) We agree with Hernandez that the Legislature's exclusion of petty buyers is more indicative of an intent to occupy the field than to allow municipalities to enact more Draconian forfeiture ordinances targeted at the lowest participants in the illegal drug food chain. We cannot accept Horton's conclusion that the Legislature left "untouched" the subject matter regulated by the ordinance given the broad scope and detailed parameters set forth in the statute regarding the forfeiture of vehicles used as instrumentalities of the drug trade. (Ibid.)

3. Comprehensive Legislation Precludes Local Regulation
The drug-related forfeiture statute that emerged after five years of experimentation and rancor demonstrates a legislative choice to completely divest Sacramento of its constitutional police power to regulate forfeiture. Such "wholesale divestiture" is comparable to the Legislature's preemption of the field of subprime home mortgage lending described in American Financial, supra, 34 Cal.4th at pages 1246-1248, 23 Cal.Rptr.3d 453, 104 P.3d 813 and quite unlike the Legislature's modest incursion into the field of gun control summarized in California Rifle, supra, 66 Cal. App.4th at pages 1311-1313, 78 Cal. Rptr.2d 591.
In American Financial, the majority and the dissent examined the legislative history of the laws regulating predatory lending to ascertain whether the Legislature clearly intended to occupy the field and thereby preclude local regulation. (American Financial, supra, 34 Cal.4th at pp. 1255, 1265-1266, 23 Cal.Rptr.3d 453, 104 P.3d 813.) Comprehensive legislation to combat predatory lending practices in the subprime home mortgage market (Fin. Code, §§ 4970-4979.8 (Division 1.6)) "delineates at length what mortgages are covered, what lending acts are prohibited, who can be held liable for violations of Division 1.6, the various enforcement mechanisms available, who may invoke such enforcement mechanisms, and defenses to such violations." (American Financial, supra, 34 Cal.4th at p. 1254, 23 Cal. Rptr.3d 453, 104 P.3d 813.) The majority held that the "provisions of Division 1.6 `are so extensive in their scope that they clearly show an intention by the Legislature to adopt a general scheme for the regulation of predatory lending tactics in home mortgages." (American Financial, at pp. 1254-1255, 23 Cal.Rptr.3d 453, 104 P.3d 813.)
By contrast, legislation on gun control has been measured. The three statutes at issue in California Rifle regarding registration, licensing, permitting, and imitation firearms demonstrated, according to the court, a choice to legislate narrowly and avoid any implication of preemption. (California Rifle, supra, 66 Cal.App.4th at pp. 1312-1313, 78 Cal.Rptr.2d 591.) Moreover, the court found that the legislative and judicial history of gun control reflects a decided avoidance of preemption and indicates the Legislature had been "cautious about depriving local municipalities of aspects of their constitutional police power to deal with local conditions." (Id. at p. 1318, 78 Cal.Rptr.2d 591.)'""The very existence of the three code sections discussed above, each of which specifically preempts a narrowly limited field of firearms regulation, is a rather clear indicator of legislative intent to leave areas not specifically covered within local control." (Ibid.)
We, too, must attempt to infer legislative intent from the historical development of the forfeiture laws. The purpose of the drug-related forfeiture statute in California *707 is to achieve a constitutional balance between the legitimate aims of law enforcement to curtail drug dealing on the streets and in neighborhoods and the rights of the owners of vehicles to due process before forfeiting their property. The Legislature itself recognized the inherent tension between the twin objectives of the 1994 reform legislation. While acknowledging that the principal objective of the state forfeiture laws is law enforcement, the Legislature expressly wrote that "[potential revenue must not be allowed to jeopardize the effective investigation and prosecution of criminal offenses, officer safety, the integrity of ongoing investigations, or the due process rights of citizens." (§ 11469, subd. (a).)
The delicate balance between the two competing interests achieved by the Legislature after the forfeiture laws expired on January 1, 1994, followed years of debate and controversy and various iterations of the laws in 1987, 1988, 1990, and 1991. But the final comprehensive statute, akin to the regulation of subprime home mortgage lending, is broad in its scope and detailed in the parameters it sets for the conditions necessary for forfeiture and the due process rights of those impacted by forfeiture. Unlike the circumscribed scope of gun control statutes, sections 11469 through 11495 are a clear indicator of legislative intent to subsume the field and not an invitation for municipal regulation of any of the bit players the legislators intended to exclude from the reach of the statute.
Yet in spite of the guidelines established by the Legislature to minimize the potential for fiscal pressures to trample due process and the arduous development of a crafted compromise, Sacramento insists that the Legislature left a gaping loophole inviting local legislation. (Isaac v. City of Los Angeles (1998) 66 Cal.App.4th 586, 601, 77 Cal.Rptr.2d 752.) We disagree. In light of the statute's legislative history, we cannot accept Sacramento's position that the Legislature left open the opportunity for charter cities to unravel the balance between law enforcement and procedural protections for property owners and to dilute the procedural protections provided property owners under the 1994 reform. To the contrary, there is no room under the state's comprehensive statutory scheme for an ordinance in the same field (Lancaster v. Municipal Court (1972) 6 Cal.3d 805, 808, 100 Cal.Rptr. 609, 494 P.2d 681) that, as the Sacramento ordinance does, expands the conditions triggering forfeiture of vehicles used in drug transactions, loosens the requisite standard of proof, omits due process protections for innocent parties, and divides up the net proceeds among local law enforcement agencies.
We conclude, therefore, that the Legislature, having declared a pervasive policy regarding drug-related forfeiture in this state and having enacted a detailed and comprehensive legislative scheme achieving a delicate balance between law enforcement and due process, has fully occupied the field. (Wilson v. Beville (1957) 47 Cal.2d 852, 860, 306 P.2d 789.) Moreover, the purpose and scope of the statute suggests a legislative assessment that vehicle owners throughout the state are entitled to uniform protection from forfeiture ordinances that increase the likelihood for abuse or dilute the protections afforded vehicle owners under the statute. Because the Legislature has occupied the field of drug-related vehicle forfeiture in California, Sacramento's ordinance conflicts with the statutory scheme.

B. Are Drug-Related Vehicle Forfeitures a Matter of Statewide Concern or Peculiarly a Municipal Concern?
According to the constitutional allocation of power described at some length *708 above, Sacramento, as a charter city, retains the authority to act in derogation of state law if the subject is not of statewide concern; that is, if the subject is a "municipal affair." Sacramento insists that nuisance abatement, as it refers to its forfeiture ordinance, remains a municipal affair. According to the city, it retains its constitutional exemption to design its own forfeiture scheme, including, if necessary, a reduction in the quality and quantity of protections afforded property owners, as a prerogative of local government to rule the home front. We must take a closer look to determine whether despite the Legislature's full occupation of the field of drug-related vehicle forfeiture, it invites cities, such as Sacramento, to dispense with procedural protections and craft their own forfeiture ordinances according to the alleged peculiarities of their blighted neighborhoods.
There is indeed some merit to Sacramento's argument that the Legislature's occupation of a field with a comprehensive statutory scheme requiring uniformity and consistent with its general declaration of policy does not mean that the subject involves a statewide concern. "`[T]he fact, standing alone, that the Legislature has attempted to deal with a particular subject on a statewide basis is not determinative of the issue as between state and municipal affairs ...; stated otherwise, the Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern.' [Citations.]" (Johnson v. Bradley (1992) 4 Cal.4th 389, 405, 14 Cal.Rptr.2d 470, 841 P.2d 990 (Johnson).)
The inherently ambiguous terms "statewide concern" and "municipal affair" represent "Janus-like; ultimate legal conclusions rather than factual descriptions." (California Fed. Savings & Loan, supra, 54 Cal.3d at p. 17, 283 Cal.Rptr. 569, 812 P.2d 916.) "The phrase `statewide concern' is thus nothing more than a conceptual formula employed in aid of the judicial mediation of jurisdictional disputes between charter cities and the Legislature, one that facially discloses a focus on extra-municipal concerns as the starting point for analysis. By requiring, as a condition of state legislative supremacy, a dimension demonstrably transcending identifiable municipal interests, the phrase resists the invasion of areas which are of intramural concern only, preserving core values of charter city government." (Ibid.)
Our task is a pragmatic one:[1] we must identify a "convincing basis for legislative action originating in extra-municipal concerns." (California Fed Savings & Loan, supra, 54 Cal.3d at p. 18, 283 Cal.Rptr. 589, 812 P.2d 916.) Our review of the legislative history of civil asset forfeiture in California has done just that. The Legislature equipped California law enforcement agencies with the same tool enjoyed by their federal counterparts to curb the drug trade in the state by confiscating the instrumentalities used in the trade as well as the fruits of the enterprise. By 1994, however, the Legislature had recognized that zealous law enforcement agencies might emphasize revenue generation over the rights of property owners. Thus, the 1994 compromise legislation represents a precarious balance between law enforcement and property owners' constitutional rights. We conclude that the Legislature's attempt to provide law enforcement with a reasonable tool with which to diminish drug trafficking in the state while preserving the constitutional rights of those whose property is forfeited originates in extra-municipal concerns and represents a statewide concern.
In addition, we are satisfied that having found the statute qualifies as a matter of statewide concern, the statute is "reasonably *709 related to the resolution of that concern" and "`narrowly tailored' to limit incursion into legitimate municipal interests." (Johnson, supra, 4 Cal.4th at p. 404, 14 Cal.Rptr.2d 470, 841 P.2d 990.) The statute quantifies the amount of drugs and limits its scope to those who facilitate the sale of substantial quantities of drugs. The Legislature, by authorizing vehicle forfeiture in some aspects of the drug trade but not others, may well have concluded that forfeiture was too severe a sanction to impose on drug buyers, who are often treated less punitively than sellers and manufacturers. Thus the Legislature, in forging the difficult balance between law enforcement and the rights of property owners, narrowly tailored the scope of the statute to capture the most egregious offenders. If, as Sacramento complains, drug buyers continue to denigrate the quality of life in its neighborhoods, it must seek to broaden the scope of the statute rather than to unilaterally dilute the procedural protections guaranteed by the state Legislature.

III

Forfeiture of Vehicles Used to Solicit Prostitution
Sacramento, like Oakland, contends that it has the freedom to opt into the state pilot program allowing the forfeiture of vehicles used to solicit prostitution or to opt out of the pilot program and subject those who forfeit their vehicles in Sacramento to an entirely different procedure with far less protection. Because the Legislature established the pilot program as a part of its comprehensive regulation in the Vehicle Code, our preemption analysis begins with an entirely different presumption.
Vehicle Code section 21 states: "Except as otherwise expressly provided, the provisions of this code are applicable and uniform throughout the State and in all counties and municipalities therein, and no local authority shall enact or enforce any ordinance on the matters covered by this code unless expressly authorized herein" (Italics added.) There is no authority that "has sanctioned an implied legislative grant of authority to local agencies on any subject that is touched upon in the Vehicle Code; quite the opposite." (Barajas, supra, 15 Cal.App.4th at p. 1815, 19 Cal.Rptr.2d 764.) Thus, in the absence of express authorization to regulate, preemption of a local ordinance will be presumed. (Rumford v. City of Berkeley (1982) 31 Cal.3d 545, 550, 183 Cal. Rptr. 73, 645 P.2d 124.)
Vehicle Code section 22659.5 delegates authority to a city or county to adopt a five-year pilot program "that implements procedures for declaring any motor vehicle a public nuisance when the vehicle is used in the commission of an act in violation of [Penal Code sections prohibiting pimping, pandering, or solicitation of prostitution]." (§ 22659.5, subd. (a).) The defendant must be convicted of the specified offense or plead to a lesser-included offense. (Ibid.) The remedies provided are limited to those stated in section 22659.5, including temporary impoundment not to exceed 48 hours and ordering the defendant not to use the vehicle again in the commission of the offense.[2]
Chapter 8.14 of the Sacramento Municipal Code, like Vehicle Code section *710 22659.5, applies to seizure of a vehicle used to solicit prostitution, except chapter 8.14 establishes its own procedures for permanent forfeiture, rather than temporary impoundment, and does not require that the vehicle be used for commission of an act punishable by the Penal Code. Rather than abiding by the rules and remedies provided by the Legislature, Sacramento simply bypassed the state's five-year pilot program and established its own permanent program. Sacramento offers at least two justifications for its regulation of the same subject matter covered by the Vehicle Code. First, it emphasizes that the state scheme inaugurates pilot programs only and participation in the program is voluntary. Second, it argues that the purpose of the state statute is traffic control, whereas chapter 8.14 is designed to combat a local nuisance.
Sacramento's position finds support in Horton, wherein the court held that the Legislature's failure to prohibit local legislation, when coupled with the temporary nature of the pilot programs, means municipalities are free to opt in or opt out of the state statutory scheme. (Horton, supra, 82 Cal.App.4th at p. 589, 98 Cal. Rptr.2d 371.) The court also concluded that whereas the Legislature was concerned with traffic control, the Oakland ordinance is "more broadly [aimed] at nuisance and blight abatement, traditionally an area of local regulation." (Id. at pp. 589-590, 98 Cal.Rptr.2d 371.) Finally, the court reasoned that the Legislature chose not to preclude local governments from promulgating conflicting ordinances by failing to include express language of preemption. (Id at p. 589, 98 Cal.Rptr.2d 371.) We find Horton's reasoning unconvincing.
Rather, we agree with Hernandez that the "opt in" language of Vehicle Code section 22659.5 means the Legislature disallowed any state mandate requiring cities to establish vehicle forfeiture programs. It does not mean that cities are free to enact their own ordinances that conflict with the statute. Sacramento's interpretation would render Vehicle Code section 22695.5 superfluous. We will not assume the Legislature acted idly, creating a statute where one was not needed. (California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist. (1997) 14 Cal.4th 627, 634, 59 Cal.Rptr.2d 671, 927 P.2d 1175.)
Nor do we accept the notion that the purpose of the statute and the purpose of the ordinance are materially different. In fact, both are designed to curtail prostitution in neighborhoods by abating the nuisances caused when vehicles are used to solicit prostitution. Yet the Sacramento ordinance imposes sanctions far more severe than those authorized by the pilot program and, in so doing, exceeds the express delegation of authority required by section 21 of the Vehicle Code. (City of Lafayette v. County of Contra Costa (1979) 91 Cal.App.3d 749, 755, 154 Cal.Rptr. 374.) The only express authorization allowed by the Legislature is participation in the pilot program.
American Financial undercuts Horton's reliance on the lack of express preemption as an indicator of a legislative intent not to preempt local regulation. The court explained, "Of course, by definition, the Legislature's implicit full occupation of a field occurs only when there is no express intent in the state law. We disagree with the Court of Appeal's statement that `when the Legislature is silent on preemption, courts presume there is no intent to preempt.' Adopting this approach would be a notable departure from our implied preemption precedents. Instead, in such circumstances we consider factors including the language and scope of the adopted *711 measure, the history behind the adopted measure, and the history of regulation in the area, as we have done in this and other field preemption cases." (American Financial, supra, 34 Cal.4th at p. 1261, 23 Cal.Rptr.3d 453, 104 P.3d 813.)
Neither Foley v. Superior Court (2004) 117 Cal.App.4th 206, 11 Cal.Rptr.3d 505 (Foley) nor Xiloj-Itzep v. City of Agoura Hills (1994) 24 Cal.App.4th 620, 29 Cal. Rptr.2d 879 (Xiloj-Itzep) are apposite. The Legislature criminalized racing contests and exhibitions in sections 23109, 23109.2, and 23109.5 of the Vehicle Code. Foley was charged under a San Diego ordinance with being a spectator at an illegal speed contest. (Foley, at p. 207, 11 Cal.Rptr.3d 505.) The Court of Appeal rejected his argument that the Vehicle Code provisions prohibiting speed contests preempted the ordinance that covered the spectators and concluded that the municipal ordinance did not conflict with the state law but complemented it. (Id. at p. 211, 11 Cal.Rptr.3d 505.) Unlike the Sacramento ordinance, which targets the same conduct as the state law, the Vehicle Code sections at issue in Foley were directed at the participants in the speed contests, not the spectators. Similarly, Vehicle Code section 22520.5, at issue in Xiloj-Itzep, prohibited solicitation on or near freeways, whereas the local ordinance regulated city streets. (Xiloj-Itzep, at p. 634, 29 Cal. Rptr.2d 879.) By contrast, Vehicle Code section 22659.5 and chapter 8.14 of the Sacramento Municipal Code cover precisely the same subjectthe disposition of a vehicle used to solicit a street prostitute.
Finally, we observe there is a dearth of documented evidence that the solicitation of prostitutes from vehicles is more pervasive or distinctive in Sacramento than in other urban cities throughout the state. Because the record does not demonstrate that Sacramento's experience of urban blight is unique, or even substantially different from Oakland's, Stockton's, or that of other urban centers, we conclude the problem is not a municipal affair under the home rule doctrine. Vehicular solicitation, it would seem from the emergence of nuisance ordinances, is, as the Legislature impliedly found, a matter of statewide concern.

DISPOSITION
The judgment is affirmed. Hernandez is awarded his costs on appeal.
We concur: SIMS, Acting P.J., and DAVIS, J.
NOTES
[1] Both parties have requested us to take judicial notice of legislative materials in connection with the preemption issue. We grant these requests without making any determination of relevancy or materiality.
[2] The original legislation specified certain named cities and counties as eligible for participation in the pilot program and included a sunset clause. In 1998 the Legislature amended the statute to delete the sunset provision and extended the pilot program to all cities and counties. (Historical and Statutory Notes, 67 West's Ann. Veh.Code (2000 ed.) foil. § 22659.5, pp. 268-269.)