Filed 3/23/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| CITY OF REDONDO BEACH, | B294016 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS172218) |
| v. | |
| ALEX PADILLA, as Secretary of State, etc., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge. Affirmed.

Xavier Becerra, Attorney General, Thomas S. Patterson, Senior Assistant Attorney General, Stepan A. Haytayan and Jonathan M. Eisenberg, Deputy Attorneys General, for Defendants and Appellants.

Michael W. Webb, City Attorney; Richards, Watson & Gershon, Lisa Bond, T. Peter Pierce and Marvin E. Bonilla for Plaintiff and Respondent.

Dennis J. Herrera, San Francisco City Attorney, Yvonne R. Meré, Chief of Complex and Affirmative Litigation, Aileen M. McGrath, Co-Chief of Appellate Litigation, and Ronald H. Lee,

Deputy City Attorney, for League of California Cities as Amicus Curiae on behalf of Plaintiff and Respondent.

_____

In 2015 the California Legislature enacted the California Voter Participation Rights Act (Elec. Code, §§ 14050-14057)[1] (VPRA) to remedy the typically low voter turnout in off-cycle local elections.[2]  The VPRA requires political subdivisions in the state to consolidate local elections with statewide on-cycle elections if the local jurisdiction's turnout falls at least 25 percent below the locality's average voter turnout in the previous four statewide general elections.

The City of Redondo Beach challenged the VPRA on the ground it improperly infringed the plenary authority conferred on charter cities by article XI, section 5, of the California Constitution to schedule their own elections for local offices.  The superior court upheld the City's challenge, issued a writ of mandate barring the Secretary of State from enforcing the VPRA against the City and declared it unconstitutional as applied to charter cities.  We affirm the judgment to the extent it restrains the Secretary from enforcing the VPRA against the City on the

_____

[1]    Statutory references are to this code unless otherwise stated.

[2]    "Elections that are held at the same time as statewide elections are often referred to as 'on-cycle' elections, while elections held at other times are often referred to as 'off-cycle' elections."  (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 415 (2015-2016 Reg. Sess.) as amended June 23, 2015, p. 5.)

ground the Legislature failed to clearly provide the VPRA applies to charter cities.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The VPRA*

The VPRA was signed into law on September 1, 2015 and became operative January 1, 2018. Section 14052, subdivision (a), provides that "a political subdivision shall not hold an election other than on a statewide election date if holding an election on a nonconcurrent date has previously resulted in a significant decrease in voter turnout." A "'[p]olitical subdivision'" is defined as "a geographic area of representation created for the provision of government services, including, but not limited to, a city, a school district, a community college district, or other district organized pursuant to state law." (§ 14051, subd. (a).) "'Significant decrease in voter turnout' means the voter turnout for a regularly scheduled election in a political subdivision is at least 25 percent less than the average voter turnout within that political subdivision for the previous four statewide general elections."[3] (*Id.*, subd. (b).)

---

[3]    Other provisions permit a political subdivision a respite from enforcement if, by the operative date of January 1, 2018, it has adopted a plan to consolidate a future election with a statewide election no later than the November 8, 2022 statewide general election (§ 14052, subd. (b)); authorize the superior court to implement appropriate remedies for a violation (§ 14053); authorize a voter who resides in the political subdivision to sue to enforce the VPRA if the political subdivision has failed to do so (§ 14055); and authorize the recovery of reasonable attorney fees and costs (§ 14054).

On July 11, 2017 the Attorney General issued an opinion concluding the VPRA applies to charter cities and school districts governed by city charter.

2. *The City of Redondo Beach's Challenge to the VPRA*

The City of Redondo Beach is a charter city. Its charter requires all municipal and school board elections to be held on "the first Tuesday after the first Monday in March of each succeeding odd-numbered year . . . ." School board elections are required to be consolidated with municipal elections. Notwithstanding these charter provisions, in October 2017 the City school board unanimously adopted a resolution rescheduling board member elections to the first Tuesday after the first Monday in November of each even-numbered year beginning in November 2020 to encourage voter participation and to comply with the VPRA. The board's resolution relied on an analysis of voter turnout rates that demonstrated "a significant decrease in voter turnout in odd-numbered years as compared to statewide election dates."

The Redondo Beach City Council considered the effect of the VPRA at a November 7, 2017 meeting. A memorandum prepared by the City Clerk and the City Attorney advised the Council there was a question as to the applicability of the VPRA to charter cities but acknowledged that the City's last four local off-cycle elections showed at least a 25 percent voter turnout decline from the average turnout of the previous four statewide general elections. A memorandum from the office of the Los Angeles County Registrar-Recorder/County Clerk to Redondo Beach's City Clerk compared the estimated costs to the City for on-cycle and off-cycle municipal elections: The costs for on-cycle general municipal elections (that is, elections consolidated with

4

statewide general elections) ranged between $97,000 and $111,000, while the projected costs for stand alone, off-cycle elections ranged between $588,000 and $593,000.

Despite these data and the school board's action, the City initiated this lawsuit, filing a petition for writ of mandate under Code of Civil Procedure section 1085 and a complaint for declaratory relief against the State of California and the Secretary of State.[4] The City sought a writ of mandate prohibiting the Secretary from applying the VPRA to the City; injunctive relief precluding the Secretary from enforcing the VPRA against the City; and a judicial declaration the VPRA is unconstitutional as applied to charter cities.

3. *The Superior Court's Decision*

The matter was briefed for the court;[5] and the League of California Cities, an association of cities throughout California,

---

[4] The City erroneously named the State of California as a defendant. A mandamus action contesting the constitutionality of a state law is properly brought against the state officer who bears the duty of enforcing that law. (*American Indian Health & Services Corp. v. Kent* (2018) 24 Cal.App.5th 772, 784; *Covarrubias v. Cohen* (2016) 3 Cal.App.5th 1229, 1231, fn. 3.)

[5] With their briefing, both sides submitted declarations from their expert witnesses. The City's expert, Douglas Johnson, Ph.D., runs an election consulting firm that advises jurisdictions on redistricting and other election issues. Dr. Johnson opined that voter turnout in off-cycle elections sometimes exceeds the turnout in on-cycle elections but had never attempted to quantify the relationship. He also opined that low voter turnout is essentially benign, reflecting the fact that "residents are happy with how things are going" and that off-cycle local elections tend to "bring out voters who are particularly interested in and aware

5

was permitted to file an amicus curiae brief in support of the City's position the VPRA does not apply to charter cities.

After a hearing the superior court made no specific findings but entered judgment in favor of the City and issued a writ of

---

of issues in their local jurisdiction."  He also pointed to the problem known as "voter roll off," which refers to the tendency of some voters to tire of lengthy ballots and leave them incomplete, to the detriment of local races found in the latter part of the ballot.

The Secretary's expert, Zoltan L. Hajnal, Ph.D., a professor of political science at the University of California, San Diego, opined that aligning municipal elections with statewide elections dramatically increases voter turnout and cited multiple studies confirming this effect.  Professor Hajnal was the lead author of a 2002 study sponsored by the Public Policy Institute of California that collected and reviewed available voter turnout data and concluded that consolidation of local elections with statewide elections offered "[t]he first and most important step to increase voter participation in city elections."  (Hajnal et al., Municipal Elections in California:  Turnout, Timing, and Competition (2002) p. xi.)  Hajnal's subsequent book, America's Uneven Democracy: Race, Turnout, and Representation in City Politics (Cambridge Press 2010), won the American Political Science Association's award for best book on urban politics.  Recent studies have confirmed Professor Hajnal's view that the voters in off-cycle elections are less representative of the public as a whole than those in on-cycle contests.  (See Kogan et al., *Election Timing, Electorate Composition, and Policy Outcomes:  Evidence from School Districts* (2018) 62 Am.J. of Pol. Sci. 637 [finding voters in on-cycle elections in California significantly more representative of the voting age population in terms of race, income and age than voters in off-cycle elections]; Anzia, Timing and Turnout: How Off-Cycle Elections Favor Organized Groups (U. Chicago Press 2014).)

mandate prohibiting the Secretary from enforcing the VPRA against the City and declared the VPRA unconstitutional as applied to charter cities.

## DISCUSSION

### 1. *Standard of Review*

A writ of mandate "may be issued by any court . . . to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded . . . ." (Code Civ. Proc., § 1085, subd. (a).) Mandamus under section 1085 is the appropriate vehicle to challenge the constitutionality or validity of statutes or other official acts. (See *Jolicoeur v. Mihaly* (1971) 5 Cal.3d 565, 570, fn. 2 [mandate is the appropriate remedy for compelling a public official to act in accordance with the law and challenging the constitutionality or validity of a statute].) Because the construction and validity of a statute is a question of law, we review the superior court's decision de novo. (*Vergara v. State of California* (2016) 246 Cal.App.4th 619, 642; accord, *Boyer v. County of Ventura* (2019) 33 Cal.App.5th 49, 53.)

### 2. *The Authority of Charter Cities over the Timing of Municipal Elections*

California law recognizes two types of cities. A city organized under the general law of the Legislature is referred to as a general law city. (Gov. Code, § 34102.) A municipality organized under a charter, like the City of Redondo Beach, is a charter city. (Gov. Code, § 34101.) As the Supreme Court explained in *State Building & Construction Trades Council of*

7

*California v. City of Vista* (2012) 54 Cal.4th 547, 555 (*Vista*), "Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs. Article XI, section 5, subdivision (a) of the California Constitution provides: 'It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith.'" (Italics omitted.) Known as the home rule doctrine, the broad authority of charter cities was originally "'enacted upon the principle that the municipality itself knew better what it wanted and needed than the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs.' [Citation.] The provision represents an 'affirmative constitutional grant to charter cities of "all powers appropriate for a municipality to possess . . ." and [includes] the important corollary that "so far as 'municipal affairs' are concerned," charter cities are "supreme and beyond the reach of legislative enactment."'" (*Id.* at pp. 555-556; see *Johnson v. Bradley* (1992) 4 Cal.4th 389, 394-398; *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 12 (*CalFed*).)

In *Johnson v. Bradley, supra,* 4 Cal.4th at page 398 the Court elaborated on the constitutional definition of "municipal affair": "Whereas subdivision (a) of article XI, section 5,

articulates the general principle of self-governance, subdivision (b) sets out a nonexclusive list of four 'core' categories that are, by definition, 'municipal affairs.'  The first three categories of municipal affairs are:  (1) regulation, etc., of 'the city police force'; (2) 'subgovernment in all or part of a city'; and (3) 'conduct of city elections.'  The final category gives charter cities exclusive power to regulate the 'manner' of electing 'municipal officers.'  It provides, '(4) plenary authority is hereby granted, subject only to the restrictions of this article, to provide [in all city charters for] the manner in which, the method by which, the times at which, and the terms for which the several municipal officers . . . shall be elected.'"  (Italics & fn. omitted.)

Charter cities' constitutional authority over municipal elections is reflected in statutes governing election timing. Section 1000 currently sets forth three "established election dates" for elections within the state:  "(a) The first Tuesday after the first Monday in March of each year[;]  (b) The second Tuesday of April in each even-numbered year[; and] (c) The first Tuesday after the first Monday in November of each year."  Section 1003, subdivision (b), however, provides that "[t]his chapter shall not apply to the following:  . . . (b) Elections held in chartered cities or chartered counties in which the charter provisions are inconsistent with this chapter," thus acknowledging and preserving the authority of charter cities over election timing.

The City's charter is consistent with section 1000, as it identifies "the first Tuesday after the first Monday in March of each succeeding odd-numbered year" for elections to fill elective offices within the City.  (Redondo Beach Charter, § 18.)  The charter further provides, "All elections held under this Charter shall be held and conducted in accordance with the provisions of

the Elections Code of the State of California as the same now exists or may hereafter be amended, for the holding of elections in general law cities unless such provisions are in conflict with the provisions of this Charter or unless an ordinance providing for the manner of holding and conducting elections is adopted by the City Council." (*Id.*, § 18.2.)

If construed to apply to charter cities, the VPRA conflicts with the City's charter, requiring the City to adopt an ordinance altering the date of its municipal elections. When a statute clearly intended to apply to charter cities appears to conflict with a city's constitutional home rule authority, a court must utilize a four-part analytical framework to determine whether the city's authority must cede to the state's: (1) "whether the city ordinance at issue regulates an activity that can be characterized as a 'municipal affair'"; (2) whether there is "'an actual conflict between [local and state law]'"; (3) "whether the state law addresses a matter of 'statewide concern'"; and (4) "whether the law is 'reasonably related to . . . resolution' of that concern [citation] and 'narrowly tailored' to avoid unnecessary interference in local governance." (*Vista, supra,* 54 Cal.4th at p. 556, quoting *CalFed, supra*, 54 Cal.3d at pp. 16-17; accord, *Marquez v. City of Long Beach* (2019) 32 Cal.App.5th 552, 565.)

3. *The Legislature Has Failed To Demonstrate a Clear Intention To Apply the VPRA to Charter Cities*

a. *Courts have usually insisted on statutory language clearly including charter cities before engaging in the* CalFed/Vista *constitutional analysis*

"'The first principle of statutory construction requires us to interpret the words of the statute themselves, giving them their ordinary meaning, and reading them in the context of the statute

10

. . . as a whole.'"  (*People v. Gonzales* (2017) 2 Cal.5th 858, 868.)
The "plain meaning" rule, however, "does not prohibit a court from
determining whether the literal meaning of a statute comports
with its purpose or whether such a construction of one provision is
consistent with other provisions of the statute.  The meaning of a
statute may not be determined from a single word or sentence; the
words must be construed in context, and provisions relating to the
same subject matter must be harmonized to the extent possible."
(*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735; see *Mendoza v.
Nordstrom, Inc.* (2017) 2 Cal.5th 1074, 1084 ["'[w]e do not construe
statutory language in isolation, but rather as a thread in the
fabric of the entire statutory scheme of which it is a part'"];
*DiCampli-Mintz v. County of Santa Clara* (2012) 55 Cal.4th 983,
992 [if the statutory language is reasonably subject to multiple
interpretations, a court will consider extrinsic aids, such as "'"the
legislative history, public policy, contemporaneous administrative
construction, and the statutory scheme of which the statute is a
part"'"'].)

   The Secretary contends the plain language of the VPRA,
which applies to a "political subdivision" defined as "a geographic
area of representation created for the provision of government
services, including, but not limited to, a city . . . ," establishes the
Legislature's intent that the VPRA applies to all cities, not just
general law cities.  The Legislature, however, is usually quite
specific when it intends the term "political subdivision" to include
charter cities.  For instance, the Government Code often specifies
"charter cities" or "any city" when defining or utilizing the term
"political subdivision."  (See, e.g., Gov. Code, §§ 53208.5, 53217.5
& 53060.1 [setting various limits on benefits for "members of the
legislative bodies of all political subdivisions of the state,

11

including charter cities and charter counties"], 8557, 8698, 12650 & 12424 ["political subdivision" includes "any city, city and county [or] county"], 37364, subd. (e) ["[t]he provisions of this section shall apply to all cities, including charter cities"].)[6]

Likewise, the Supreme Court and courts of appeal have often demanded a clearer indication than the use of a general

[6]    The City and amicus curiae League of California Cities identify several other statutes defining "political subdivision" to include charter cities or otherwise specifying their application to charter cities. (See, e.g., Pub. Util. Code, §§ 5810 ["political subdivision" defined as "a general law city, general law county, charter city, charter county, charter city and county"], 21010 ["political subdivision" defined as "any county, city, city and county . . . or other political entity"], 21690.6 ["[t]he provisions of this article shall apply to any airport owned or operated by a political subdivision, including a charter city"]; Rev. & Tax. Code, §§ 30462 [section 30111 prohibits imposition of taxes by "any city, charter city, town, county, charter county, city and county, . . . or other political subdivision or agency of this state"], 18670, subd. (a) ["political subdivision" includes "a city organized under a freeholders' charter"]; Pub. Contract Code, §§ 7203, subd. (c) [applies to "a city, charter city, county, charter county, . . . and any other political subdivision"], 20671, subd. (b) [defining "public entity" as "any city, charter city, city and county, . . . or political subdivision of the state"]; Bus. & Prof. Code, § 16117 ["'City' includes a charter city"]; Health & Saf. Code, § 12081, subd. (e) ["no city, county, city and county, or other political subdivision of this state, including, but not limited to, a chartered city, county, or city and county"]; Elec. Code, § 306 [term "city measure" includes "any proposed city charter"]; Veh. Code, § 34002, subd. (a) ["no state agency, city, city and county, county, or other political subdivision of this state, including, but not limited to, a chartered city, city and county, or county, shall adopt or enforce any ordinance or regulation . . . inconsistent with this division"].)

term, be it "a political subdivision" or "a city," before concluding a statute is intended to apply to charter cities.[7]  In *Vista*, *supra*, 54 Cal.4th at page 554 the Supreme Court cited an earlier version of the prevailing wage law that "expressly referred to charter cities in a provision requiring such cities to pay prevailing wages in contracts for street or sewer improvement work."  Similarly, in *Johnson v. Bradley*, *supra*, 4 Cal.4th 389, the statute at issue (the Political Reform Act of 1974, Gov. Code, §§ 81000-91015)

---

[7]      In fact, the term "political subdivision of the state" has been construed to distinguish counties from "municipal corporations" with separate and distinct powers and purposes.  In rejecting a claim that former Civil Code section 3287 applied to municipal corporations, the Supreme Court explained in *Abbott v. City of Los Angeles* (1958) 50 Cal.2d 438, 467-468, "'A county is a governmental agency or political subdivision of the state, organized for purposes of exercising some functions of the state government, whereas a municipal corporation is an incorporation of the inhabitants of a specified region for purposes of local government.'  This view was relied upon and reiterated in *Otis v. City of Los Angeles* (1942) 52 Cal.App.2d 605, 611-612, wherein it was decided that actions for declaratory relief under section 1060 of the Code of Civil Procedure may be maintained against municipal corporations.  In so deciding the court expressly recognized . . . [citations] that section 1060 of the Code of Civil Procedure does not authorize the bringing of an action for declaratory relief against the state or its political subdivision, but declared [citation] that 'respondents' contention that the legal status of a municipal corporation is akin to that of a county cannot be sustained either upon reason or authority.'"  (See, e.g., Wat. Code, §§ 83-60 [addressing powers of "[a]ny district, municipality, or political subdivision of the State"], 8618 [addressing power of "[a]ll political subdivisions, agencies of the State, and municipal and quasi-municipal corporations" to make agreements relating to flood control].)

13

contained a provision (Gov. Code, § 82008) expressly defining "city" to mean "a general law or a chartered city." (See also *Anderson v. City of San Jose* (2019) 42 Cal.App.5th 683, 694 [as provided by Gov. Code, § 54221, subd. (a), the Surplus Land Act (Gov. Code, §§ 54220-54233) "applies to 'every city, whether organized under general law or by charter'"].) In *Marquez v. City of Long Beach*, *supra*, 32 Cal.App.5th at page 569, this court found the minimum wage provisions of certain Industrial Welfare Commission's wage orders apply to charter cities because the wage orders used the term "'any city.'" (See also *Baggett v. Gates* (1982) 32 Cal.3d 128, 131 [Public Safety Officers Procedural Bill of Rights Act (Gov. Code, §§ 3300-3311) applies to "any" public safety department (Gov. Code, § 3309.5, subd. (a))]; *Trader Sports, Inc. v. City of San Leandro* (2001) 93 Cal.App.4th 37, 45 ([determining provisions of Proposition 62 to be "facially applicable to charter cities"; Gov. Code, § 53720, subd. (a), defined "'local governments' for purposes of implementing Proposition 62's provisions as including 'any county, city, city and county, *including a chartered city or county*'"].)

Only two recent decisions have not addressed this threshold statutory issue: *Jauregui v. City of Palmdale* (2014) 226 Cal.App.4th 781 (*Jauregui*) and *City of Huntington Beach v. Becerra* (2020) 44 Cal.App.5th 243. In each of those cases, the court engaged in the *CalFed/Vista* constitutional analysis without first considering whether the Legislature intended the statute to apply to charter cities.[8] Their significance for our

---

[8] Our review of the briefing in those cases confirms that neither city made a statutory argument regarding the Legislature's intention and instead focused on the conflict

14

decision on this point is therefore quite limited:  "[I]t is axiomatic that cases are not authority for propositions not considered." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176; see *Johnson v. Bradley, supra,* 4 Cal.4th at p. 415 (conc. & dis. opn. of Mosk, J.).)

>    b. *The legislative history of the VPRA does not indicate a clear intention to include charter cities*

The VPRA does not include a comprehensive definition of its intended reach.  As introduced by State Senator Benjamin Hueso, Senate Bill No. 415 stated, "It is the intent of the Legislature to enact legislation to prohibit a political subdivision from holding an election on a date other than the date of a statewide direct primary election or statewide general election if doing so would result in a significant decrease in voter turnout as compared to the voter turnout at a statewide election."  (Sen. Bill No. 415 (2015-2016 Reg. Sess.) § 1, as introduced Feb. 25, 2015.) An amended version designated the title of the bill and defined "political subdivision" as "a geographic area of representation created for the provision of government services, including, but not limited to, a city, a school district, a community college district, or other district organized pursuant to state law."  (Sen. Bill No. 415 (2015-2016 Reg. Sess.) as amended Apr. 6, 2015.) The definition of "political subdivision" remained unchanged thereafter and is codified in section 14051, subdivision (a).

Senate Bill No. 415's definition of "political subdivision" was apparently borrowed from the California Voting Rights Act, Elections Code section 14025 et seq. (CVRA), enacted in 2002 to prevent political subdivisions from using at-large elections to

---

between the respective statutes at issue and the cities' constitutional home rule authority.

dilute the votes of members of a protected class. (See § 14026, former subd. (c), added by Stats. 2002, ch. 129, § 1.) Ruling on a challenge to the CVRA in *Jauregui, supra,* 226 Cal.App.4th 781, Division Five of this court assumed the Legislature intended the CVRA to apply to charter cities and evaluated the statute under the analytical framework of *CalFed* and *Vista*, concluding that the dilution of votes of a protected class is a matter of statewide concern and does not unnecessarily infringe on the constitutional authority of charter cities. (*Jauregui*, at pp. 795-802.)

Only two weeks before the introduction of Senate Bill No. 415, however, Assemblymember Roger Hernández, a co-author of the bill, introduced Assembly Bill No. 277 (2015-2016 Reg. Sess.), which amended the CVRA's definition of political subdivision to encompass "a geographic area of representation created for the provision of government services, including, but not limited to, a general law city, general law county, charter city, charter county, charter city and county, a school district, community college district, or other district organized pursuant to state law." (§ 14026, subd. (c).) Enacted into law (see Stats. 2015, ch. 724, § 2), Assembly Bill No. 277 expressly affirmed the Legislature's intent to clarify the CVRA's application to charter cities and counties and to codify the holding in *Jauregui*. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 277 (2015-2016 Reg. Sess.) as amended Apr. 7, 2015, p. 3.)

The City contends this essentially contemporaneous amendment of the CVRA to expressly include charter cities and introduction of the VPRA using the original, less specific definition of "political subdivision" demonstrate the Legislature did not intend the VPRA to apply to charter cities. Otherwise, it

16

argues, the Legislature would have utilized the more inclusive definition of a political subdivision in the VPRA. (See *Scher v. Burke* (2017) 3 Cal.5th 136, 144-145 ["[a]s a general rule, when the Legislature uses a term in one provision of a statute but omits it from another . . . we generally presume that the Legislature did so deliberately, in order "'to convey a different meaning"'"].)

Indeed, an analogous legislative background led the Supreme Court in *Ector v. City of Torrance* (1973) 10 Cal.3d 129 (*Ector*) to reject a claim that a state statute barring local agencies from requiring employees to live within their jurisdiction prevailed over a contrary city charter provision. There, the City of Torrance fired an employee when it was discovered he lived outside the city. The employee sued for reinstatement citing Government Code section 50083, enacted in 1970, which provided, "No local agency or district shall require that its employees be residents of such local agency or district." Government Code section 50001 defined "'[l]ocal agency' as used in this division" to mean "county, city, or city and county, unless the context otherwise requires." The Court reasoned the definition did not include charter cities because, in the legislative session immediately following the adoption of section 50083, the Legislature had rejected an attempt in the Assembly to amend the definition of "local agency" to expressly include charter cities and to limit cities' constitutional authority to implement residency requirements. (*Ector*, at pp. 133-134.) As the Court explained, "We may reasonably infer that by so voting the Legislature rejected the very extension of the statute which appellant now asks us to adopt under the guise of judicial construction. This, of course, we may not do." (*Id.* at p. 134.)

17

In addition to analyzing this legislative history of Government Code section 50083, the *Ector* Court recognized that broadly construing the definition of "local agency" to include a charter city would raise a serious constitutional question and explained, "We must presume that in adopting section 50083 the Legislature intended to enact a valid statute." (*Ector*, *supra*, 10 Cal.3d at p. 133.) Accordingly, to prevent a conflict with the "explicit constitutional authorization" of charter cities to set their employees' qualifications, the Court held the Legislature "meant to limit [section 50083's] reach to general law cities." (*Ibid.*; see *People v. Buza* (2018) 4 Cal.5th 658, 682 ["a statute will be interpreted to avoid serious constitutional questions if such an interpretation is fairly possible"]; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1373 ["[w]hen a question of statutory interpretation implicates constitutional issues, . . . "[i]f a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable""]; see also *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230 [courts """will not decide constitutional questions where other grounds are available and dispositive of the issues of the case"""].)[9]

_____

[9] A legislative proposed, voter approved constitutional amendment in 1976 revised Article XI, section 10, of the Constitution to disallow residency requirements of the sort relied on by the City of Torrance.

In addition to Assembly Bill No. 277, Assemblymember Hernández introduced Assembly Bill No. 254 (2015-2016 Reg. Sess.) during the same legislative session. That bill sought to require cities, school districts, community college districts and special districts to hold their general elections in conjunction with statewide elections by deleting the off-cycle election dates from section 1000, as well as the exemption for charter cities in section 1003. Citing the plethora of research (including Professor Hajnal's) showing that consolidation of local elections with statewide elections is the single best means of increasing voter turnout, the bill declared its intent to apply to every political subdivision in the state, including charter cities and counties. (See Assem. Bill No. 254 (2015-2016 Reg. Sess.) as amended Mar. 18, 2015, §§ 2-4; Assem. Com. on Elections and Redistricting, Analysis of Assem. Bill No. 254 (2015-2016 Reg. Sess.) as amended March 18, 2015.) On June 1, 2015, however, the bill was amended to delete the proposed amendments to section 1003, which, in essence, ensured any amendments to section 1000 would not apply to charter cities that had adopted conflicting election dates in their charters. Ultimately, Governor Jerry Brown vetoed this bill, citing the changes to election timing already enacted by Senate Bill No. 415. (See Assem. Bill No. 254 (2015-2016 Reg. Sess.) §§ 1-5; Governor's veto message to Assem. on Assem. Bill No. 254 (Oct. 1, 2015) (2015-2016 Reg. Sess.); Off. of Assem. Floor Analysis, Governor's Veto analysis of Assem. Bill No. 254 (2015-2016 Reg. Sess.) as enrolled Sept. 4, 2015, p. 2.) But the history of Assembly Bill No. 254 indicates its author encountered significant resistance to his proposal to withdraw section 1003's exemption for charter cities and suggests a similar struggle would have ensued if there had been an effort to

19

expressly include charter cities within the reach of Senate Bill No. 415.

Against this legislative backdrop the Attorney General issued an opinion concluding the VPRA could be constitutionally applied to charter cities.  (100 Ops.Cal.Atty.Gen. 4 (2017).)  The opinion stated, "As a threshold matter, we find that the Legislature intended the Act to apply to charter cities and school districts."  (*Id.* at p. 7.)  In support of this conclusion the Attorney General relied on the purported plain meaning of "city" and "political subdivision," without confronting the inherent ambiguity of those terms.  Further, his opinion presumes the definition of "political subdivision" was taken from the CVRA, as do we, but asserts that definition was found by the *Jauregui* court to include charter cities without addressing the fact that the *Jauregui* court did not actually construe the statute and find an intent to include charter cities, but simply proceeded directly to the *CalFed / Vista* constitutional analysis.

Finally, the Attorney General's opinion cites the comments of Senator Hueso, who indicated his understanding the application of the VPRA to charter cities would not violate the Constitution.  (100 Ops.Cal.Atty.Gen., *supra*, at p. 7, fn. 30, citing Assem. Standing Com. on Elections and Redistricting, Hearing (July 1, 2015), testimony of Sen. Ben Hueso [stating his view the VPRA does not violate the constitutional rights of charter cities].)  As amicus curiae League of California Cities points out, "[T]he expressions of individual legislators generally are an improper basis upon which to discern the intent of the entire Legislature." (*People v. Farrell* (2002) 28 Cal.4th 381, 394; see *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 845 ["we have repeatedly declined to discern legislative intent from comments

20

by a bill's author because they reflect on the views of a single legislator instead of those of the Legislature as a whole"].)  More telling is the comment on charter cities found in legislative analyses of Senate Bill No. 415 that acknowledge ~~that~~ charter cities have substantial autonomy over the rules governing the election of municipal officers and observes "By potentially compelling charter cities to change the dates of their regularly scheduled municipal elections, this bill goes to the heart of [that] autonomy. . . .  This bill does not explicitly address the question of whether it is intended to be applicable to charter cities, however, so it is unclear whether those cities would be subject to a lawsuit under this bill."  (Assem. Floor Analysis, 3d reading analysis of Sen. Bill No. 415 (2015-2016 Reg. Sess.) as amended June 23, 2015, at p. 2; Assem. Com. on Elections and Redistricting, Analysis of Sen. Bill No. 415 (2015-2016 Reg. Sess.) as amended June 23, 2015, p. 5.)

This comment, especially when viewed in light of Assembly Bill No. 277's contemporaneous amendment of the CVRA to expressly include charter cities, reinforces our view that the Legislature deliberately left unresolved the question whether the VPRA applies to charter cities, placing on the courts the responsibility to divine intent from ambiguous language.  Under these circumstances, guided by the precept that, when reasonable, we will construe a statute to render it free from doubt as to its constitutionality, where the Constitution confers plenary authority on charter cities to set the timing of their elections, we will not infer an intent to contravene that authority without more explicit guidance from the Legislature.[10]

---

[10]     Because we affirm the superior court's judgment issuing a writ of mandate prohibiting the Secretary of State from enforcing

21

# DISPOSITION

The judgment of the superior court ordering a peremptory writ of mandate is affirmed.  The City is to recover its costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.

DILLON, J.[*]

---

the VPRA against the City of Redondo Beach, we do not address the court's declaration that the VPRA is unconstitutional.  (See *Santa Clara County Local Transportation Authority v. Guardino*, *supra*, 11 Cal.4th at p. 230.)

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.